Milton Wuzael MATHIS, Appellant,

v.

The STATE of Texas.

No. 73,621.

Court of Criminal Appeals of Texas.

Feb. 13, 2002.

J. Sidney Crowley, Houston, for Appellant.

John J. Harrity, III, Asst. DA, Richmond, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., PRICE, WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted of capital murder in September 1999. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h).

On December 15, 1998, at approximately 8:00 or 8:30 a.m., Esmerelda Lester and her 15–year old daughter Melanie Almaguer went to Chris Lentsch's home. Lentsch rented rooms to Travis Brown and Daniel Hibbard. Brown and appellant were in Brown's room. While Lester, Almaguer and Hibbard sat in Lentsch's room, Lentsch went into the kitchen. Shortly thereafter, Lentsch heard gunshots from Brown's room and turned to see appellant exiting the room with a gun in his hand. Appellant claimed that Brown had just shot himself. Lentsch told appellant to put the gun down, but appellant ordered Lentsch and the other three back into Lentsch's room where he calmly walked up to Almaguer and shot her in the head, leaving her alive, but paralyzed from the neck down. Appellant then shot Hibbard in the head, causing his death. Appellant finally pointed the gun at Lester, whereupon he discovered that he was out of bullets. Appellant thereafter rummaged through the house, set fire to

Brown's room, threatened Lester and Lentsch, and finally left in Brown's car.

The police identified appellant as the killer and went to arrest him. Upon being arrested, appellant became violent. Officers discovered that appellant had told his father to lie for him and had persuaded his girlfriend to give him an alibi, which she maintained until confronted by the police. A fellow inmate testified that appellant showed no remorse for the shootings and stated that he wished he had killed them all.

Appellant took the stand and at first testified that although he had been to the house earlier, he was not there on the morning of the shootings. After defense counsel requested a recess, appellant took the stand and stated that he had lied in his previous testimony. He then testified that he was at the house at the time of shootings, and admitted that he had shot all three people and taken Brown's car. Appellant claimed he shot Brown in self-defense after Brown had threatened to shoot him.[2] He claimed that he shot the others because he panicked after shooting Brown.

During the punishment phase, the State put on evidence of appellant's prior criminal history, including an aggravated robbery, various assaults and thefts, and a charge for resisting arrest. The State presented additional evidence that appellant had been repetitively belligerent and disruptive at school and that he had gotten into a fight with jailers while incarcerated.

In his tenth point of error, appellant claims that the evidence presented at trial was legally insufficient to support the

---

1. Unless otherwise indicated all future references to Articles refer to the Code of Criminal Procedure.

2. Appellant claimed Brown held the gun to appellant's head and threatened to kill him.

Appellant testified he knocked the gun out of Brown's hand, and when Brown started walking toward him, appellant closed his eyes and pulled the trigger.

jury's finding that he would be a continuing threat to society. *See* Art. 37.071 § 2(b)(1). In reviewing the sufficiency of the evidence at punishment, this Court looks at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have believed beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Allridge v. State*, 850 S.W.2d 471 (Tex.Crim.App. 1991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). The facts of the crime alone can be sufficient to support the affirmative finding to the special issue. *Allridge*, 850 S.W.2d at 488. Additionally, we have consistently defined "society" as encompassing both the prison population and the free population. *See Griffith v. State*, 983 S.W.2d 282, 300 n. 9 (Tex.Crim.App.), *cert. denied*, 528 U.S. 826, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999).

The facts in the instant case demonstrate a calculated crime which culminated in execution-style killings. The State's evidence reflected that appellant was always in control of his actions and showed no remorse. In addition to these facts, the State showed that appellant had a litany of past behavior problems and had committed a number of criminal violations. Given the facts in the instant case, and the nature and number of the other extraneous acts shown, a rational jury could reasonably have concluded that appellant would continue to be a threat to society. The evidence is legally sufficient to support the jury's affirmative answer to the future dangerousness issue. *Jackson* and *Allridge*, both *supra*. Point of error ten is overruled.

 In his first two points of error, appellant claims the trial court erred in denying his challenges for cause to two venirepersons. To preserve error on allegedly erroneously denied challenges for cause, an appellant must demonstrate that he asserted a clear and specific challenge for cause, that he used a peremptory challenge on the complained-of venireperson, that all of his peremptory challenges were exhausted, that his request for additional strikes was denied, and that an objectionable juror sat on the jury. *Green v. State*, 934 S.W.2d 92, 105 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997). The record in the instant case shows that appellant used only thirteen of his fifteen peremptory challenges. Appellant has failed to preserve error on these points. Points of error one and two are overruled.

 In his third point of error, appellant claims the trial court erred in granting the State's challenge for cause to venireperson Villamayor based on her views against the death penalty. Under *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a venireperson may be excluded for cause consistent with the Sixth Amendment to the United States Constitution when his views on capital punishment are such that they would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Clark v. State*, 929 S.W.2d 5, 6–7 (Tex. Crim.App.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997); *Vuong v. State*, 830 S.W.2d 929, 942 (Tex.Crim.App.), *cert. denied*, 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *Moody v. State*, 827 S.W.2d 875, 888 (Tex. Crim.App.), *cert. denied*, 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). Prospective jurors may not be excused merely because their beliefs about the death penalty might influence the decision-making process. *Clark, supra*.

Two weeks prior to Villamayor's individual questioning, the trial judge explained to the entire panel of veniremembers the procedural sequence of a death penalty case. The judge told the panel that the jury is first called upon to decide whether a capital murder defendant is guilty. The judge continued to explain that, if the jury found the defendant to be guilty, then the trial continued into a second phase where punishment was determined. The judge stressed to the veniremembers that a Texas jury is never required to assess a sentence of death or life imprisonment. Rather, the jury is required to answer a series of questions, and the answers to those questions would dictate to the judge what punishment should be assessed. Finally, the judge described to the panel the questions the jury would be required to answer.

During Villamayor's individual questioning, the prosecutor first went through several answers she had given on her questionnaire indicating that she was morally opposed to the death penalty. The prosecutor also noted responses in which Villamayor had indicated that she believed that there were circumstances in which the death penalty was appropriate. However, in response to specific questioning, Villamayor commented that killing just two individuals was not such a case. Rather, Villamayor stated that she felt the death penalty was appropriate only in such cases as when a person "kill[ed] a whole village."

■ The prosecutor then reminded Villamayor of the judge's instructions and explanations two weeks earlier and proceeded to expand upon the procedure followed in the punishment phase of a capital trial, the meanings of the questions asked, and the law involved.[3] As the prosecutor explained the mitigation question and asked the venireperson questions concerning it, the following exchange occurred:

[PROSECUTOR:] [A]re you of such a nature, ma'am, that you will almost always answer this [mitigation question] yes because then you know the person probably would receive a Life Sentence? Are you in that category, or would you go ahead and look at it and then answer it appropriately?

\* \* \*

MS. VILLAMAYOR: I would probably be in that category.

[PROSECUTOR:] That you would automatically answer it?

MS. VILLAMAYOR: Yes, I think I would.

[PROSECUTOR:] Are your—are your feelings about the Death Penalty, is that the reason why you would probably automatically always find mitigating circumstances?

MS. VILLAMAYOR: Yes.

\* \* \*

[PROSECUTOR:]—are your beliefs so strong, . . ., you are going to have problems setting them aside?

MS. VILLAMAYOR: I believe they are.

[PROSECUTOR:] Do you think—let me ask you one last time in regard to—and in a different fashion so that we are clear and there is no conflict here. Do you—do you believe that your personal opinions, your personal beliefs about the Death Penalty, being opposed to it, is going to substantially affect you in answering this question regarding mitigating circumstances?

3. Before a veniremember can be properly challenged for cause, the law must be explained to her and she must be asked whether she can follow that law regardless of her personal views. *See Jones,* 982 S.W.2d at 390.

MS. VILLAMAYOR: Yes.

The prosecutor then challenged Villamayor for cause and the judge passed her to the defense for questioning. During defense counsel's questioning, Villamayor continued to state that her beliefs would influence her judgment and she was not sure that she could be open-minded during the process.

Given the totality of the voir dire, the trial judge was within his discretion in determining that Villamayor's views on capital punishment were such that they would have prevented or substantially impaired the performance of her duties as a juror in accordance with her instructions and her oath. *Wainwright, supra; see also Colburn v. State,* 966 S.W.2d 511, 518 (Tex.Crim.App.1998). Point of error three is overruled.

■■■■ Appellant asserts in his fourth and fifth points of error that the trial court erred in overruling his *Batson* challenge to the State's use of peremptory strikes on prospective jurors J. Grooms and M. Adams.[4] *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under *Batson,* a defendant must initially establish a *prima facie* showing of racial discrimination in the State's exercise of its peremptory strikes. The burden then shifts to the State to articulate race-neutral explanations for its questioned strikes. Once the prosecutor has articulated race-neutral explanations, the burden shifts back to the defendant to show that the explanations are really a pretext for discrimination.[5] The trial court must then determine whether the defendant has car-

ried his burden of proving racial discrimination. The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous. *See Chamberlain v. State,* 998 S.W.2d 230, 236 (Tex.Crim.App.1999), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000).

During the *Batson* hearing in the instant case, the prosecutor explained that he had struck venireperson Grooms because she had indicated that she was in favor of the death penalty only in those instances where the defendant requested the death penalty and the crime was of the most violent nature. She also noted that she felt the death penalty was imposed too often and that Texas had put a lot of people to death. With regard to prospective juror Adams, the prosecutor told the judge that he had struck her because she had indicated that she needed proof beyond any doubt and because she had two children, one of whom was about appellant's age.

The trial court then gave appellant an opportunity to rebut the prosecutor's explanations. Appellant responded by stating that the prosecutor used his strikes in a improper manner and that this was the most blatant violation of due process he had seen in twenty-three years of practicing law. The trial court overruled the *Batson* claim.

The State's explanations were facially race-neutral and appellant did not point to any evidence of pretext. The trial court did not abuse its discretion in finding that appellant failed to carry his burden of

---

**4.** At trial appellant challenged nine of the State's strikes, but on appeal he complains only about the strikes to Grooms and Adams.

**5.** Once the responding party has offered a race-neutral explanation for a peremptory challenge and the trial court has ruled on the

ultimate question of purposeful discrimination, the preliminary issue of whether the party raising the *Batson* challenge made a *prima facie* case becomes moot. *See Malone v. State,* 919 S.W.2d 410, 412 (Tex.Crim.App. 1996).

showing purposeful discrimination. *See Pondexter, v. State*, 942 S.W.2d 577, 581–82 (Tex.Crim.App.1996)(defendant's rebuttal insufficient to establish State's explanations were pretext); *Chambers v. State*, 866 S.W.2d 9, 25 (Tex.Crim.App.1993)("absent some other evidence which rebuts the State's race-neutral explanation, we will not disturb the trial court's finding that the State's explanation is legitimate"). Appellant's fourth and fifth points of error are overruled.

In his sixth point of error, appellant claims the trial court erred in refusing to instruct the jury on the lesser-included offense of manslaughter in the death of Daniel Hibbard, the second victim named in the indictment. He asserts that a finding that he was guilty of a lesser degree of criminal homicide in Hibbard's case would necessarily negate one of the elements required to convict him of capital murder. He contends that the evidence raising the issue of whether he was guilty of the lesser degree of criminal homicide came from his own testimony. Specifically, appellant repeatedly denied during his testimony that he had intended to kill anyone. He claimed that he killed Brown in self-defense and then just pulled the trigger in a panic when Hibbard turned around, but insisted he was acting recklessly and not intentionally.

To determine whether a charge on a lesser-included offense should be given, this Court has implemented a two-step test. *See Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Crim.App.1985); *Royster v. State*, 622 S.W.2d 442, 444 (Tex.Crim.App.1981) (plurality opinion). The first step is to decide whether the offense is a lesser-included offense of the offense charged. *See* Article 37.09; *see also, e.g., Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim. App.), *cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Aguilar*, 682

S.W.2d at 558. We have recognized that manslaughter is a lesser-included offense of capital murder. *See Cardenas v. State*, 30 S.W.3d 384, 392–93 (Tex.Crim.App. 2000). Hence, the first prong of the test is satisfied.

The second step of the *Aguilar/Rousseau* test requires an evaluation of the evidence to determine whether there is some evidence that would permit a jury rationally to find that the defendant is guilty *only* of the lesser offense. *Moore v. State*, 969 S.W.2d 4, 8 (Tex.Crim.App. 1998); *Rousseau*, 855 S.W.2d at 672. In other words, there must be some evidence from which a jury could rationally acquit the defendant of the greater offense while convicting him of the lesser-included offense. *Moore*, 969 S.W.2d at 8. The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Wesbrook v. State*, 29 S.W.3d 103, 113–14 (Tex.Crim.App. 2000), *cert. denied*, 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001); *Arevalo v. State*, 943 S.W.2d 887, 889 (Tex.Crim.App. 1997).

Contrary to appellant's claim that he shot Brown in self-defense, the medical examiner testified that Brown had suffered two bullet wounds to the head, one of which entered from the back. The evidence of appellant's actions following Brown's shooting reflected that he was calm and calculated, not that he was panicked or frightened. He shot Almaguer between the eyes and Hibbard in the head. Although appellant claimed he acted "recklessly" with the gun and did not intend to kill anyone, his testimony about the shootings was fraught with inconsistencies. For example, he vacillated between insisting he had not aimed the gun when shooting and stating that he had indeed aimed and shot:

I did not actually know at the time that I was—I was shooting [Almaguer]. I did aim the gun and pull the trigger, but I never meaned [sic]—I just shot. I never aimed it or anything. It just hit her.... I never said I didn't aim the gun and pull the trigger. I have been telling you the whole time that I did aim the gun and pull the trigger .... after they started hollering and screaming, then I went in there and that's when I aimed and pulled the gun and pulled the trigger.... I said I pointed the gun—I said I pointed it—I aimed—I didn't mean to just point it.... I just pointed it and shot.... I just pointed the gun and shot. I wasn't even really just looking ... when I shot the gun, but I did aim it over there. I wasn't never even looking ... I just pulled the trigger.... I just closed my eyes and shoot [sic].

Appellant's testimony that he did not intend to kill anyone does not amount to evidence upon which a jury could rationally find appellant *only* acted recklessly with respect to killing Hibbard, and not intentionally. Appellant had already shot and killed Brown with two shots to the head. He admitted to aiming and firing the gun. With four shots, he killed two people and hit the third between her eyes. Those who saw him testified his actions were calm and collected. In a similar case, *Wesbrook v. State*, 29 S.W.3d 103 (Tex. Crim.App.2000), the defendant killed five people. He sought an instruction on a lesser-included offense of aggravated assault. We upheld the trial court's refusal of the instruction:

> The evidence must establish the lesser-included offense as a valid alternative to the charged offense. In the instant case, the trial record shows appellant acted intentionally, or at the least, knowingly, when he walked into an apartment armed with a high-powered rifle. He fired a single shot at close range into the chest of the first victim, a highly vulnerable part of the body. *After witnessing the damage that resulted from his actions, appellant continued to fire the weapon,* again at close range, into four more individuals, choosing as his target, either their head, chest, or abdomen. Physical evidence from the scene and the condition of the bodies suggest that one victim was shot as he attempted to escape from the apartment and another was shot while on his knees. *The only contrary evidence that this was not an intentional or knowing act is appellant's own assertion that he did not intend to kill. Given the state of the entire record, this was not evidence from which a jury could rationally conclude that appellant was guilty only of aggravated assault.*

*Wesbrook,* 29 S.W.3d at 113–14 (emphasis added); *see also Jackson v. State,* 992 S.W.2d 469, 475 (Tex.Crim.App.1999) (not entitled to instruction on the lesser-included offense of aggravated assault when evidence showed appellant, at least, guilty of homicide). Apart from appellant's own testimony that he did not intend to kill anyone, there was no other evidence in support of such theory, and in fact the evidence refuted that testimony. We hold appellant's testimony does not supply evidence upon which a jury could rationally find appellant's actions toward Hibbard were merely reckless and were not at least knowing. Hence, appellant has failed to satisfy the second prong of the *Aguilar/Rousseau* test. Appellant's sixth point of error is overruled.

 In his seventh point of error, appellant complains that "[t]he prosecutor committed reversible error when he referred to [a]ppellant in final argument as a 'despicable piece of human trash.'" Appellant failed to object at trial to the prosecutor's arguments, however, and therefore

forfeited his right to complain about this issue on appeal. Tex.R.App. P. 33.1; *Ladd v. State*, 3 S.W.3d 547, 569 (Tex.Crim.App. 1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). Appellant urges us to overrule *Cockrell v. State*, 933 S.W.2d 73 (Tex.Crim.App.1996), in which we held that a defendant must pursue to an adverse ruling his objections to jury argument. Appellant argues that such inflammatory, prejudicial statements cannot be cured by an instruction to disregard, and thus it would be pointless to object in order to secure an ineffective instruction. But even if an the error was such that it could not be cured by an instruction, appellant would be required to object and request a mistrial. Nonetheless, we decline to overrule *Cockrell*, a case perfectly in line with Rule of Appellate Procedure 33.1 and the policies underlying preservation of error. Point of error seven is overruled.

■ In his eighth point of error, appellant claims his trial counsel failed to render effective assistance by neglecting to object to the prosecutor's comments during final argument concerning his non-testimonial courtroom demeanor.

■ To show an ineffective assistance of counsel claim, an appellant must first demonstrate that his trial counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)(adopted by this Court in *Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim.App.1986)). Second, he must also show that his counsel's deficient performance was so serious that it prejudiced his defense, rendering the trial unfair and the verdict suspect. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Lockhart v. Fretwell*,

506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). In other words, appellant must show by a preponderance of the evidence that trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that this deficient performance rendered the result of the proceeding unreliable. *Strickland, supra; McFarland v. State*, 845 S.W.2d 824, 843 (Tex.Crim. App.1992), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993).

Appellant made no effort to prove the prejudice prong under *Strickland*. *Ladd v. State*, 3 S.W.3d 547, 570 (Tex.Crim.App. 1999); *Mitchell v. State*, 989 S.W.2d 747, 748 (Tex.Crim.App.1999). Point of error eight is overruled.

■ In his ninth point of error, appellant claims the trial court erroneously overruled his objection to "victim impact" testimony concerning surviving victim Almaguer. Appellant relies on *Cantu v. State*, 939 S.W.2d 627 (Tex.Crim.App. 1997), *cert. denied*, 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997) as support for his claim.[6]

In *Cantu, supra*, the defendant was involved in the kidnaping, rape and murder of two girls in the same criminal episode. During the punishment phase of his trial for the kidnaping, rape and murder of one of the girls, the State presented testimony from the mother of the second victim regarding her daughter's good character, the family's search for her, and the impact of the crime on the family. The defendant objected that this "victim impact" evidence regarding a victim not named in the indictment was not relevant to the special issues, and that it was more prejudicial than probative. *Id.* at 636. We agreed that the

---

6. Although appellant discusses *Cantu*, he does not actually develop an argument regarding the admission of the evidence.

evidence as to her good character, activities she enjoyed, and the impact of her death on her family was not relevant as appellant was not on trial for her murder and such evidence served no purpose other than to inflame the jury. We held such evidence to be irrelevant and highly prejudicial. *Id.* at 637.

The testimony at issue in the present case, however, is distinguishable from that evidence which was at issue in *Cantu.*

During the punishment phase of appellant's trial, the State called Janelle Manning, a nurse who had been caring for Almaguer for approximately four months, to testify. Appellant objected, arguing that although the testimony of Manning was relevant, he felt that the prejudicial effect of the testimony far exceeded its probative value. The State, in response to appellant's objection, argued that it would only be asking Manning to testify about the medical care provided to Almaguer on a daily basis and the things that were done in order to keep Almaguer alive. The trial court agreed to allow Manning to testify, however, it limited the testimony to the technical procedures required in the day-to-day care of Almaguer, while expressly curtailing any testimony regarding the psychological impact of Almaguer's paralysis, or any testimony pertaining to her feelings of pain.

In *Mosley v. State,* 983 S.W.2d 249 (Tex. Crim.App.1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999), we discussed the meaning of "victim impact" and "victim character" evidence. We explained that "victim impact" evidence is evidence that is "generally recognized as evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." *Id.* at 261. "Victim character" was defined as evidence that is "generally recognized

as evidence concerning good qualities possessed by the victim." *Id.*

The testimony at issue here does not fall under either category of victim-related evidence. Unlike in *Cantu,* in which the evidence involved testimony regarding both the victim's good qualities and the effect that her death had on family members, the testimony in the present case did not involve testimony about how third persons were affected by the crime, nor was there any discussion about the character of the victim. Manning's testimony focused solely on the medical procedures involved in the care of Almaguer. Appellant's characterization of Manning's testimony as victim impact evidence is incorrect. Point of error nine is overruled.

Appellant's conviction is affirmed.

JOHNSON, J., joined the majority except as to point nine and filed a concurring opinion.

COCHRAN, J., filed a concurring opinion joined by WOMACK, HERVEY, HOLCOMB, JJ.

JOHNSON, J., filed a concurring opinion.

I join the majority, except as to point of error nine, and concur in that point.

Melanie Almaguer was both a witness to the offense charged in the indictment before the jury and the victim of an offense not charged in it. Her testimony was appropriate during the guilt/innocence phase as to guilt and during the punishment phase as to future dangerousness. Her testimony and obvious physical condition were probative of those two issues. However, the intimate details of her daily life, which were introduced through the testimony of Janice Manning, had no such probative value. It seems to me that such evidence is not admissible, not because it is non-victim "victim-impact" testimony, but

because it is irrelevant to the issue of future dangerousness and cumulative of the testimony of Melanie Almaguer.

Ms. Almaguer testified that appellant had fired a bullet into her head at close range and that the bullet had passed through her forehead and mouth and had lodged in her shoulder, where it remains. She testified, and the jury could see, that she is permanently paralyzed from the neck down. A reasonable juror would infer that "permanently paralyzed from the neck down" means that she had lost control of all bodily functions in that area of her body. The reasonable juror would then conclude that those functions would have to be attended to by another. The precise details of what that care required was not probative as to future dangerousness, but could be highly prejudicial.

The facts which are probative of future dangerousness are that appellant killed Brown and Hibbard, then shot Ms. Almaguer at close range, apparently without provocation, and that he chose to shoot her in the head, a wound which had a high probability of death or serious permanent disability. He intended her death. Manning's testimony added nothing substantive to that discussion. I would hold that admission of her testimony was error.

That said, I believe that the admission of Manning's testimony was harmless in this case. The facts of the case may be sufficient to establish future dangerousness. *Allridge v. State*, 850 S.W.2d 471, 488 (Tex. Crim.App.19991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). Beside the mere facts of the case, the state called at the punishment phase nine witnesses who testified that appellant has a history of violent behavior dating back to high school and continuing to the time of trial. There was testimony that appellant has engaged in violent behavior both in free society and while in custody. Given the other punishment evidence, it is probable that Manning's testimony, while inflammatory and irrelevant, had but a slight effect on the jury's decision.

The rest of the question of harm is the effect of the use of Manning's testimony during closing statements, during which the prosecutor urged the jury to remember the intimate details of Ms. Almaguer's toileting needs when it considered the issue of future dangerousness. Such details were irrelevant to future dangerousness and appear to be intended to inflame the emotions of the jurors. I would hold that such argument was error. Again, given the facts of the case and the evidence presented at punishment, I would find the error harmless in this case.

COCHRAN, J., filed a concurring opinion in which WOMACK, HERVEY, and HOLCOMB, JJ., joined.

I join the majority opinion in every respect. I add this concurrence for two reasons. First, I respectfully disagree with Judge Johnson's concurrence insofar as she concludes that Ms. Manning's evidence was erroneously offered and admitted on the punishment issue of "future dangerousness." Second, I think we should distinguish "victim impact" evidence which concerns the emotional consequences upon the crime victim's relatives from "victim impact" evidence which concerns the physical or psychological consequences of the defendant's conduct upon a crime victim himself.

Nothing in the record suggests that the State offered Ms. Manning's testimony during the punishment phase of this capital murder trial *solely* on the issue of appellant's future dangerousness. Clearly,

this evidence was also relevant[1] under article 37.071(e)(1) as evidence militating against appellant's mitigation question.[2] I cannot conclude that the permanent paraplegic injuries that fifteen-year-old Melanie Almaguer suffered, including the impact of those physical injuries upon her daily life, are not relevant "circumstances of the offense" with which to assess appellant's moral culpability for this crime. In assessing a defendant's moral culpability, it is highly probative that the child he attempted to murder, by shooting her in the head at close range will, for example, be confined to a wheelchair for the rest of her life, just as it is relevant that she will be required to wear diapers, be lifted into a bathtub, and never be able to bear children. If, in assessing the defendant's moral culpability, the jury is entitled to consider the defendant's difficult childhood, why then should it not be entitled to consider the difficult adulthood that his victim will suffer as a direct consequence of his criminal actions?

Judge Johnson states that the jury properly heard that appellant "intended her [Ms. Almaguer's] death. Manning's testimony [regarding Melanie Almaguer's injuries and care] added nothing substantive to that discussion."[3] I cannot agree. The actual physical consequences of the injuries appellant inflicted, as well as their continuing physical impact upon one of his chosen victims, are probative of his moral culpability, as is the fact that he intended to kill her.

Moreover, there is an important legal and factual distinction between "victim impact" testimony and testimony that shows the actual physical disabilities and impairments suffered by a person as a result of the defendant's criminal conduct. The expression "victim impact" testimony has become a legal term of art in capital murder jurisprudence. According to the Supreme Court, "victim impact" evidence may be admitted in a capital murder prosecution to show the victim's "uniqueness as a human being." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Such evidence is admissible at the punishment stage because:

1. Indeed, at trial, appellant's counsel admitted the relevance of this evidence. He argued that the trial court should have excluded the evidence as unfairly prejudicial under rule 403. However, a defendant may not claim that the consequences of his conduct were so gruesome that the jury should not hear or see of those consequences. As this Court stated in *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex.Crim.App.1995):

 The photographs are gruesome. That is to say, they are disagreeable to look at, but they depict nothing more than the reality of the brutal crime committed. The photographs are powerful visual evidence, probative of various aspects of the State's theory of the offense including the brutality and heinousness of the offense. Appellant must realize that it is precisely the quality which we describe as "powerful" which gives rise to his arguments that the photographs are prejudicially inflammatory. But when the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence.

 See also, *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex.Crim.App.1999), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000).

2. TEX.CODE CRIM. PROC. art. 37.071(e)(1) sets out the defendant's mitigation question:

 Whether, taking into consideration all of the evidence, *including the circumstances of the offense*, the defendant's character and background, and *the personal moral culpability of the defendant*, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
 (emphasis added).

3. Ante at 921.

931

"the state has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family. . . ." *Id.*

The objected-to evidence in this case, however, was not that type of "victim impact" testimony. Instead, it was the testimony of Ms. Almaguer's nurse, who explained how this young girl's physical abilities had been drastically and permanently affected by appellant's act of shooting her in the head. Ms. Almaguer is permanently paralyzed; she has lost most of her normal bladder and bowel functions; she must be catheterized every few hours; she must have special "bladders" positioned and repositioned on her chair throughout the day to avoid bedsores; and she must take a variety of medications to control muscle spasms, and to ward off possible renal failure and neurological problems.

In *Miller–El v. State,* 782 S.W.2d 892, 894–95 (Tex.Crim.App.1990), a non-capital case, this Court found that a doctor's testimony, which was exactly analogous to the nurse's testimony in this case, was both relevant and admissible at the punishment stage. In *Miller–El,* the doctor's testimony was summarized as follows:

[Dr.] Harrison outlined for the jury the "special needs" that "[a] spinal chord [sic] patient, as we call them, . . . will have . . . related to their injury for the rest if their life." He testified that as a result of his paralysis, Hall will never regain bladder and bowel control. Nor will he ever recover sexual and procreative functions. He will be required to maintain a constant vigilance to prevent infection and bed sores. Recurring

spasticity may ultimately deprive him even of the use of a wheelchair.

782 S.W.2d at 894. This Court held that evidence of the extent of a victim's physical injuries and future physical impairment is admissible as a circumstance of the offense "so long as a factfinder may rationally attribute moral culpability to the accused for the injury." *Id.* at 896; *see also Stavinoha v. State,* 808 S.W.2d 76, 78–9 (Tex.Crim.App.1991) (in aggravated sexual assault case, testimony of psychological trauma suffered by child victim and physical manifestations of that trauma was properly admitted). Surely, this jury could rationally attribute moral culpability to appellant for the permanent physical injuries he inflicted upon Ms. Almaguer by shooting her in the head. I fail to understand why one would hold this evidence, a shooting victim's future physical impairment, admissible in a non-capital case, but inadmissible in a capital murder punishment hearing under a theory that it either lacks any probative value or that it is substantially more prejudicial than probative.

Just as civil courts distinguish between subjective "mental anguish" and "pain and suffering" on the one hand, and objective "physical impairment" on the other hand, so too can judges in criminal cases distinguish between a victim's (or his family's) mental anguish and his or her physical disabilities. The former, because they are so purely subjective and incapable of objective demonstration, are much more likely to be unfairly prejudicial.

Sometimes both kinds of "victim impact" evidence, both subjective emotional injuries and objective physical disabilities, are highly probative and admissible. At other times, it is appropriate for a court to exercise its discretion to exclude the emotional impact evidence while admitting the evi-

dence of physical repercussions. This trial judge did the latter, by admitting evidence of Ms. Almaguer's physical injuries and future physical impairment, but excluding the more subjective evidence of her emotional trauma. I do not fault him in the least.

With these comments, I join the opinion of the Court.