

NUMBER 13-09-124-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

DANIEL GONZALEZ CASTANEDA,                               Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

## On appeal from the 370th District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

## Before Justices Garza, Vela, and Perkes
## Memorandum Opinion by Justice Vela

A jury convicted appellant, Daniel Gonzalez Castaneda, of murder. *See* TEX. PENAL CODE ANN. § 19.02(b) (Vernon 2003). After finding he had a previous felony conviction, the jury assessed punishment at life imprisonment. In three issues, Castaneda argues the evidence is legally insufficient to support his conviction, and he

complains of charge error.   We affirm.

I. FACTUAL BACKGROUND

## A. State's Evidence

On March 21, 2008, Pablo Magallan was driving a friend, Victor Cavazos, to Cavazos's Hidalgo County home when a black Ford Expedition passed Magallan's vehicle and cut in front of him.   Cavazos knew that Magallan's neighbor, Castaneda, nicknamed "Puerco", drove such a vehicle.   Cavazos testified that they began following the Expedition because Magallan wanted to find out why the driver "cut him off."   Both vehicles then parked on Melba Carter Street in Mission, Texas (the street on which both Magallan and Castaneda lived), and Cavazos saw Castaneda standing next to the Expedition's driver's side door.   Magallan, who was not carrying any weapons, walked "[w]ith his hands down, on his side" toward Castaneda.   Cavazos testified that "[r]ight when he [Magallan] got about . . . six, eight feet, [from Castaneda] that's when I saw the shadow, the gun come out of Puerco's hand, and I saw the sparks come out."   Cavazos said he "heard a gunshot. . . .   And then Pablo [Magallan] just . . . collapsed."

On cross-examination, Cavazos testified he recognized Castaneda as the shooter "because of his physical attributes."   When defense counsel asked him, "So did you assume that it was Daniel because of his physical attributes, as you say?", he said, "Yes, ma'am."

Officer Esteban Jara was dispatched to Magallan's home at 304 Melba Carter and saw Magallan lying on the ground with a bullet wound below his rib cage.   He asked, "[W]ho shot you?", and Magallan said, "Daniel."   He asked Magallan where Daniel lived,

2

and he pointed in a westward direction and said, "[H]e lives here." Officer Jara testified his investigation revealed that Castaneda lived in the residence and occasionally drove a black Ford Expedition.

Castaneda's sister, Manuela Ruiz, testified that on the evening in question, she was at Castaneda's home and heard a gunshot. Afterwards, she saw that Cavazos "reached to the back [of Magallan], [and] . . . got a gun out. . . ." Cavazos ran with the gun toward Magallan's house and returned to the scene before the police arrived.

On cross-examination, Ruiz testified she saw Magallan "trying to get something from his back." When defense counsel asked her, "And was he [Magallan] walking toward where Daniel was at?", she said, "No. He was walking toward the door where we were at." She said Cavazos "reached to his [Magallan's] back and got a gun."

On re-direct-examination, when the prosecutor asked Ruiz, "So then you got to see when your brother [Castaneda] shot him [Magallan]? You didn't only hear the shot, . . . but you got to see it?", she said, "Yes." She stated that the weapon that Cavazos took from Magallan "was a silver, like, an automatic. . . ." She said that after the shooting, Castaneda left in his Expedition.

Castaneda's nephew, Rene Loredo, Jr., testified that after the shooting, he picked up Castaneda, who was carrying a rifle, and took him to a motel. A few days later, Loredo moved him to Mexico. Afterwards, police recovered a rifle that was found underneath a mattress in the motel room where Castaneda had stayed. Shortly thereafter, Mexican authorities apprehended Castaneda and delivered him to Mission police.

3

While at the Mission Police Department, Castaneda waived his *Miranda*[1] rights and provided a written statement to the police in which he stated, in relevant part, that on the evening in question, he returned home after picking up his nephew, Leroy Espinoza. They left Castaneda's home in Castaneda's black Expedition with Espinoza driving the vehicle. As they drove toward Bryan Road, a Dodge passed them and hit the curb. Castaneda told Espinoza to turn around and go back home. When they turned to go home, Castaneda saw the Dodge "reversing and then came back behind us." When they returned home, Castaneda ran into the house, found a rifle, and loaded it. When he went outside, "Pablo" kept telling him, "'Pos' que onda?'"[2] He stated that Pablo "kept getting closer, but I kept telling him that he needed to leave. Every time I said something, he kept getting closer. I was not sure to shoot, but since he was getting closer, but at one point I guess I decided to pull the trigger. . . ." He stated that, "[w]hen I shot Pablo he just fell to the ground. . . . As soon as I saw him go to the ground, I ran to the Expedition with the rifle and drove away. . . ." He stated that, "I had put the rifle under the mattress in the [motel] room" before leaving for Mexico.

During its case-in-chief, the State introduced the rifle that was recovered from the motel room into evidence.[3] Loredo identified the rifle as the one that Castaneda was carrying when he took him to the motel.

Dr. Norma Farley, the forensic pathologist who conducted Magallan's autopsy, testified his cause of death "was a perforating gunshot wound to the abdomen." She

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The English translation in the reporter's record is, "Well, what's up?"

[3] The State introduced the rifle into evidence as State's exhibit 56.

4

recovered bullet fragments from his lumbar vertebral column, and she recovered another bullet fragment from the musculature of his lower back. She stated that a blood specimen from Magallan showed he was intoxicated.

## B. Defense Evidence

Leroy Espinoza testified that on the evening in question, he was driving Castaneda's Expedition while Castaneda sat in the front-passenger seat. Espinoza stated that after he passed a black truck, it passed them "through the shoulder. And then right when he was right next to us, he stepped on it. And that's when he just went real fast, and I guess he noticed the stop sign coming and he hit the brakes." Espinoza said that the black truck went through the stop sign, hit a ramp, and "landed almost in front of the pole." The black truck started to follow them, and Castaneda told Espinoza "to go home." Espinoza drove to Castaneda's home at 302 Melba Carter and parked the vehicle. Castaneda got out and told Magallan to leave. Espinoza testified he saw Magallan "[b]y the house, like probably already half ways of the house" and walking "toward Mr. Castaneda." When defense counsel asked Espinoza to describe what Magallan was doing as he approached Castaneda, he said, "Just kept on repeating what he was saying, all mad." Espinoza testified Castaneda had "a weapon," and when defense counsel asked Espinoza to "describe what Pablo Magallan was doing as he was coming toward . . . Mr. Castaneda?", he said, "Kept on just arguing. When . . . Mr. Castaneda was telling him, 'chispale,' leave, leave my house, leave my house. The more Mr. Castaneda was trying to back off, the more Pablo was enforcing, going his way. And he was going his way, reaching back, . . . ." When defense counsel asked Espinoza

5

to "describe . . . how it is that he [Magallan] was reaching back?", he said, "He was going like that, like, Who the hell do you think you are?   But reaching back, like reaching back. Who do you think you are, coming like that, still walking toward Mr. Castaneda." Espinoza stated that Castaneda "was moving back."   When defense counsel asked Espinoza, "And what happened next?", he said, "I just heard a fire" and Castaneda "just leaves."

Castaneda did not testify during the guilt-innocence phase of the trial.

## II. DISCUSSION

## A. Sufficiency Of The Evidence

In issue one, Castaneda argues the evidence is legally insufficient to support his conviction.

### 1. Standard Of Review

"When conducting a legal sufficiency review, a court must ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'–not whether '*it* believes that the evidence at trial established guilt beyond a reasonable doubt.'"   *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S 307, 318-19 (1979)) (emphasis in original). "In doing so, we assess all of the evidence 'in the light most favorable to the prosecution.'" *Id.* (quoting *Jackson*, 443 U.S. at 319).   "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element."   *Id.* at 518.   We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution.

6

*Jackson*, 443 U.S. at 326.

Our review of a legal sufficiency challenge should be examined under the principles of review for a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

### 2. Applicable Law

A person commits murder when he or she (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person acts intentionally when it is his or her conscious desire to cause the result of his or her conduct. *Id.* § 6.03(a). A person acts knowingly when he or she is aware that his or her conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person's knowledge and intent may be inferred from the "acts, words, and conduct of the accused." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). The charge instructed the jury they could convict Castaneda of murder if they found beyond a reasonable doubt that on or about March 21, 2008, he "intentionally or knowingly cause[d] the death of an individual, namely, PABLO MAGALLAN, JR. AKA PABLE MAGALLAN, by shooting him with a firearm. . . ." (emphasis in original).

7

### 3. Analysis Of Sufficiency Challenge

A rational jury could have determined the following from the evidence: (1) Espinoza and Magallan parked their vehicles on Melba Carter Street; (2) Magallan and Castaneda got out of their vehicles; (3) as Magallan approached Castaneda, Castaneda shot him and fled the scene; (4) when Castaneda shot Magallan, Magallan fell to the ground; and (5) Magallan died from a gunshot wound to the abdomen. A fact finder may draw an inference of guilt from the circumstance of flight from the crime scene. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007). Furthermore, Castaneda's attempt to conceal his weapon by hiding it underneath a mattress in his motel room is probative of wrongful conduct and is also a circumstance of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2007) (stating that "[a]ttempts to conceal incriminating evidence, are probative of wrongful conduct and are also circumstances of guilt.").

Controverting evidence showed that: (1) a firearms and tool marks examiner could not determine whether the bullet fragments removed from Magallan's body were fired from the rifle recovered from the motel room where Castaneda had stayed, and (2) Cavazos could not positively identify Castaneda as the person who shot Magallan. However, the jury apparently chose to believe the other evidence, such as Magallan's dying declaration that "Daniel" shot him, Ruiz's testimony that she saw Castaneda shoot Magallan, and Castaneda's statement to the police in which he confessed to shooting Magallan. The jury is the exclusive judge of the facts proved and of the weight given to the testimony. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979). Therefore, the

8

jurors were free to accept or reject any or all of the witnesses' testimony. *Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Alvarado v. State*, 818 S.W.2d 100, 105 (Tex. App.–San Antonio 1991, no pet.)); *see also Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) (stating "[t]he jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record."). We must defer to the jury's determination. *See Clayton*, 235 S.W.3d at 778 (stating that "[w]hen the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). Viewing all the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find Castaneda guilty of Magallan's murder beyond a reasonable doubt.

By this same issue, Castaneda contends the evidence is legally insufficient because after the State finished its case-in-chief, but before it rested, it amended the indictment and did not thereafter reintroduce all of the evidence that it had introduced prior to amendment of the indictment. After the State completed its case-in-chief, but before it rested, the prosecutor requested to amend the indictment to allege the victim's name as "Pablo Magallan Jr. a/k/a Pablo Magallan."[4] With respect to the offered amendment, defense counsel stated, "I have no objection, Judge." The trial court granted the amendment, and the prosecutor read the amended indictment in open court to the jury. After defense counsel informed the court that Castaneda's plea to the amended indictment was "not guilty," the State then rested its case. Even if we assume that after the State amended the indictment, it was required to reintroduce the evidence

---

[4] The original indictment alleged the victim's name only as "Pablo Magallan."

that it had introduced during its case-in-chief, defense counsel has waived the issue by failing to object to the failure to reintroduce the evidence. *See* TEX. R. APP. P. 33.1. We note that the evidence showed the victim was known both as Pablo Magallan and as Pablo Magallan, Jr. Issue one is overruled.

**B. Lesser-Included Offense Instruction**

In issue two, Castaneda argues the trial court erred by denying his request for an instruction on the lesser-included offense of manslaughter. When evaluating charge error, we first determine whether there was error in the charge. *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g); *see Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, "the next step is to make an evidentiary review . . . as well as a review of any other part of the record as a whole which may illustrate the actual, not just theoretical, harm to the accused." *Almanza*, 686 S.W.2d at 174 (op. on reh'g).

In deciding whether the trial court should have charged the jury on a lesser-included offense, we apply a two-prong test. *Segundo v. State*, 270 S.W.3d 79, 90 (Tex. Crim. App. 2008); *see Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007). First, we decide if the offense is a lesser-included offense of the alleged offense. *Segundo*, 270 S.W.3d at 90; *see Salazar v. State*, 284 S.W.3d 874, 875-76 (Tex. Crim. App. 2009); *Hall*, 225 S.W.3d 526, 535 (holding the sole test to decide the first step of the two-prong test is the cognate-pleadings approach, which examines the elements of the offense and the facts in the charging instrument). Second, we determine if some evidence exists in the record "from which a rational jury could acquit the defendant of the

greater offense while convicting him of the lesser included offense." *Segundo*, 270 S.W.3d at 90-91. The lesser-included offense is only an option if the evidence establishes it as a valid, rational alternative to the charged offense. *Id.* at 91 (citing *Arevalo v. State*, 943 S.W.2d 887, 889 (Tex. Crim. App. 1997)). The court of criminal appeals has held that anything more than a scintilla of evidence can be enough to afford the defendant a lesser-included charge. *Hall*, 225 S.W.3d at 536.

A person commits murder when he or she (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person commits manslaughter if he or she "recklessly causes the death of an individual." *Id.* § 19.04(a). "A person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id.* § 6.03(c).

Under code of criminal procedure article 37.09(3), manslaughter is a lesser-included offense of murder. *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003); *Moore v. State*, 969 S.W.2d 4, 9-10 (Tex. Crim. App. 1998). Because the law is well established that manslaughter is a lesser-included offense of murder, the first prong is satisfied. *Girdy v. State*, 213 S.W.3d 315, 318 (Tex. Crim. App. 2006); *Arnold v. State*, 234 S.W.3d 664, 671 (Tex. App.–Houston [14th Dist.] 2007, no pet.). The only difference between the two offenses is the required mental state. *Arnold*, 234 S.W.3d at 671.

In *Mathis v. State*, the defendant shot three people, killing two and wounding the third. 67 S.W.3d 918, 921 (Tex. Crim. App. 2002). The defendant argued to the court of criminal appeals that the trial court erred in failing to instruct the jury on the lesser-included offense of manslaughter in the death of the second victim because he (the defendant) acted recklessly with the gun, and he did not intend to kill anyone. *Id.* at 925. The court of criminal appeals concluded the defendant "admitted to aiming and firing the gun." *Id.* at 926. The court stated that even though the defendant wanted a lesser-included charge, "[a]part from [the defendant's] own testimony that he did not intend to kill anyone, there was no other evidence in support of such theory, and in fact the evidence refuted that testimony." *Id.* The court, therefore, held that an instruction on a lesser-included charge of manslaughter was not appropriate. *Id.*

Here, Castaneda stated in his written statement that he ran into the house, found a rifle, loaded it, and went back outside. When he went outside, "Pablo" kept telling him, "'Pos' que onda?'" Castaneda stated that, "I was not sure to shoot, but since he was getting closer, but at one point I guess I decided to pull the trigger. . . ." The evidence in this case does not constitute evidence upon which a jury could rationally find that Castaneda only acted recklessly with respect to killing Magallan. *See id.* Castaneda's statement does not supply evidence upon which a jury could rationally find that Castaneda's actions toward Magallan were merely reckless and were not at least knowing. Because there is not sufficient evidence from which a jury could rationally acquit Castaneda of murder while convicting him of manslaughter, the second prong of the test fails. Thus, we hold the trial court did not err in refusing to instruct the jury on the

12

lesser-included charge of manslaughter.   Issue two is overruled.

## C. Self-Defense Instruction

In issue three, Castaneda argues the trial court erred in denying his self-defense instruction.   Castaneda requested a jury instruction on self-defense, but the trial court denied the instruction.

### 1. Standard Of Review

A trial court must instruct the jury on all defensive issues raised by the evidence and requested by the defendant.   *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984); *In re E.C.I.*, 278 S.W.3d 510, 521 (Tex. App.–Houston [14th Dist.] 2009, pet. denied).   "[I]f the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction of the issue."   *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001) (footnote omitted).

"[A] person is justified in using force against another in self-defense when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."   TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2010).   A person is justified in using deadly force against another in self-defense "[i]f the actor would be justified in using force against the other [person] under Section 9.31" and "when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force."   *Id.* § 9.32(a)(1), (a)(2)(A).

"Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious

13

bodily injury." *Id.* § 9.01(3). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). The term "reasonably believes" in section 9.32 includes the concept that a defendant "is justified in defending against danger as he reasonably apprehends it." *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). Thus, a defendant has the right to defend himself from apparent danger to the same extent as he would if the danger were real. *Id.*

### 2. Analysis

When, as in this case, the defendant "used deadly force, there must be some evidence to satisfy the requisites of sections 9.31 and 9.32 of the Texas Penal Code." *Guilbeau v. State*, 193 S.W.3d 156, 159 (Tex. App.–Houston [1st Dist.] 2006, pet. ref'd) (citing *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984)). Thus, "some evidence" must exist to show the defendant "reasonably believed that use of deadly force was immediately necessary to protect himself against a use of unlawful deadly force by" the victim. *Id.* at 159-60. In the absence of evidence of the victim's use or attempted use of deadly force, the section 9.32 defense is not available. *Id.* at 160; *Preston v. State*, 756 S.W.2d 22, 25 (Tex. App.–Houston [14th Dist.] 1988, pet. ref'd).

Testimony showed that: (1) Magallan followed Castaneda to Melba Carter Street; (2) Magallan was "trying to get something from his back" as he approached Castaneda; (3) Magallan was mad at Castaneda; (4) when Castaneda told Magallan to leave, he refused to do so; and (5) after the shooting, Cavazos took a gun from Magallan

14

that he had behind his back. However, for a self-defense instruction to be required, there must be "some evidence" to show that Castaneda reasonably believed that use of deadly force was immediately necessary to protect himself against a use of unlawful deadly force by Magallan. In Castaneda's statement to the police, he stated that Magallan followed him and Espinoza to Melba Carter Street. When Espinoza parked at Castaneda's house, Castaneda ran into his house, found a rifle, loaded it, and went outside. Magallan kept telling Castaneda, "'Pos' que onda?'" Castaneda stated that Magallan "kept getting closer, but I kept telling him that he needed to leave. Every time I said something he kept getting closer. I was not sure to shoot, but since he was getting closer, but at one point I guess I decided to pull the trigger. . . ." Castaneda did not state that he either saw or believed that Magallan was reaching for a weapon, that he knew Magallan carried a weapon on his person, or that he believed Magallan was carrying a weapon at the time of the shooting. Furthermore, Castaneda did not state he believed the action he took was necessary to defend his life.

Viewed in the light most favorable to Castaneda, the facts and circumstances surrounding the shooting do not constitute some evidence that Castaneda reasonably believed deadly force was immediately necessary to protect himself against a use or attempted use of unlawful deadly force by Magallan. Castaneda was not entitled to a self-defense instruction if his use of force was in response to verbal provocation alone. *Hamel*, 916 S.W.2d at 494. We hold that the trial court did not err by denying Castaneda's self-defense instruction. Issue three is overruled.

15

## III. CONCLUSION

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
10th day of March, 2011.