Affirmed and Opinion filed June 14, 2007








Affirmed and Opinion filed June 14, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00141-CR

____________

 

DAVID GERALD ARNOLD, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 337th
District Court

Harris County, Texas

Trial Court Cause No. 977,832

 



 

O P I N I O N

A jury convicted
appellant David Gerald Arnold of murdering Kenneth Wimbley and 








assessed
punishment at ten years= confinement in the Institutional Division
of the Texas Department of Criminal Justice.  On appeal, he challenges his
conviction and sentence on the grounds that the trial court improperly refused
his requests for a manslaughter instruction and for instructions limiting the
use of extraneous-offense evidence, failed to instruct the jury to disregard
improper arguments, and abused its discretion by refusing to allow defense
counsel to conduct a second redirect examination of appellant and by selecting
incomplete or inappropriate material to be read to the jury in response to its
requests.  Appellant also presents contingent requests for abatement and
remand.  We overrule each of appellant=s issues, deny his
requests, and affirm the conviction. 

I.  Factual and Procedural
Background

Although he has
been married to someone else since 1998, appellant had been romantically
involved with Erica Woodard Aon and off@ since
approximately 1993 and they had a son who resided with Woodard.  According to
Woodard, she ended her relationship with appellant about six months before the
events at issue, but appellant visited their son two or three times a week. 
Woodard also had been in a romantic relationship with the decedent, Kenneth
Wimbley, since early 2003, and they were engaged to be married in January 2004.


Appellant and Woodard planned to have
dinner together on February 17, 2004, but Woodard Ablew it off.@  She and her son
instead met Wimbley for dinner and returned to her apartment at approximately
9:15 p.m.  Woodard was preparing to bathe her son when appellant knocked on her
door.  After she let him in, he asked where she had been, but she refused to
tell him.  At about this time, Wimbley telephoned Woodard and told her that he
was coming over, and Woodard repeated this information to appellant.  Appellant
then finished bathing his son, put him to bed, and remained in the kitchen
talking with Woodard until Wimbley knocked at Woodard=s door. 








Woodard testified
that she did not see a gun before the shooting, but stated that appellant
yelled at her and pushed her while she was trying to get to the door.  She
opened the door four to six inches, but opened it no further because it was
locked with a chain lock and a security latch.  Woodard testified that she
asked Wimbley to wait in the car until appellant left, but he would not leave. 
According to Woodard, she had been speaking with Wimbley for five to seven
minutes when she heard a gunshot.  She testified that she heard Wimbley say he
had been shot and saw him grab his chest before she closed the door to unlock
the security latch and chain.  Woodard stated that she took her cordless phone
and followed Wimbley, who had run to the other side of a breezeway, while
appellant left in another direction.  Woodard found Wimbley on the ground
bleeding from the neck.  According to Woodard, Wimbley had his cell phone.  She
did not  know if he had been trying to call someone, but she took his phone and
called 911 on her own cordless phone.[1]


          Appellant testified that he
retrieved a gun from Woodard=s bedroom after Wimbley arrived at the
apartment and began yelling and banging at the door.  He further testified that
Woodard tried to take to take the gun from him and to stay between him and the
door.  According to appellant, Wimbley kept asking Woodard, AAre you okay? 
What did that MF do to you?  Are you okay?@  Appellant
testified that he was afraid that Wimbley would cause him serious bodily
injury, that he believed his child=s life could be in
danger, and that he just wanted to leave.  He stated that he fired one shot
while Wimbley was holding the door handle and the door immediately closed as if
Wimbley fell back when he was shot.  According to appellant, he and Woodard then
went into the living room and had a conversation before she grabbed a telephone
and they both left the apartment.  Appellant went to his vehicle and drove away
while Woodard went in a different direction on foot.  Appellant denied that he
ever chased Wimbley or armed himself and looked for Wimbley outside of the
apartment.  On cross-examination he admitted that he never attempted to call
for help, either before or after shooting Wimbley, and that after he learned
that Wimbley was coming to the apartment, he did not attempt to leave before
Wimbley arrived.  On redirect, he was asked whether it was his intention to
kill Wimbley or to keep himself or his son from getting hurt.  He responded, ATo keep myself
from getting hurt, and my son.@  He also admitted that Wimbley did not
display a weapon.








Rex Evans, a
deputy for the Harris County Sheriff=s Office, was the
first of the emergency personnel to arrive at the scene.  He found Wimbley
semi-conscious next to a staircase in a breezeway about fifty feet from Woodard=s apartment. 
Evans saw that  Wimbley had been shot in the neck and spoke to him to help him
stay conscious.  According to Evans, Wimbley told him that David Arnold shot
him.  

After paramedics
arrived, Evans spoke with a juvenile, C.L., who had been standing close to
Evans as he knelt over Wimbley.  Evans testified that C.L. was crying and told
him, AYeah, they were
running around . . . and David shot him.@








Thirteen-year-old
C.L. testified that he saw appellant bringing flowers to Woodard shortly before
4:00 p.m. on the afternoon of the shooting.  He further testified that as he
was taking out the trash at approximately 10:05 p.m., he saw Wimbley going up
some stairs to the third floor balcony.[2] 
C.L. said that he also saw a black man on the third floor with a gun, and he
saw Wimbley running back down the stairs.  According to C.L, he continued to
the dumpster and after he threw in the trash, he heard appellant yell, AHere he is.@  C.L. testified
that after appellant ran upstairs, C.L. ran to try Ato get away from
them.@  C.L. stated that
just before he reached a breezeway, Wimbley ran down the stairs at the end of
the breezeway and said to C.L., AStay back because
I don=t want you to get
hurt.@  C.L. testified
that he stopped, but when Wimbley had gone into the breezeway Aa little,@ C.L. heard a
shot, followed seconds later by a second shot.  C.L. went into the breezeway to
see if Wimbley had been shot and found him lying on the ground; C.L. testified
that he also saw appellant running away down the breezeway while tucking a gun
into his pants.  C.L. testified that Wimbley yelled to him to get Woodard, but
C.L. saw that she was already coming down the stairs.  He further testified
that after appellant ran, he saw a black male run down the stairs from the
third floor and take the same path taken by appellant.  C.L. went into his
apartment and called 911.[3] 
After reviewing his police statement, C.L. admitted that he did not always
identify appellant by name in the statement, but sometimes instead said Aa black man.@

Sherman Perry
testified that he had a long telephone conversation with Wimbley during these
events.  According to Perry, the call began at around 9:30 p.m. when Wimbley
was home packing to spend the night with Woodard.  Perry said that later in the
conversation, Wimbley said that appellant had a gun and was chasing him. 
According to Perry, Wimbley was breathing hard and was frightened.  Perry
testified that he heard two gunshots and heard Wimbley say, AI was hit.@  He further
testified that he tried to keep Wimbley talking after that, and Wimbley said AI=m getting cold.@  Perry said that
at some point, another person picked up Wimbley=s cell phone, but
Perry stayed on the phone while he traveled to the scene.  Perry did not hear
appellant or Woodard ask Wimbley to leave.

Detective William
Vallero testified that blood evidence was found only around the location where
Wimbley was found in the breezeway just under the foot of the stairs.  Dr.
Stephen Wilson, Assistant Medical Examiner, testified that stippling around the
gunshot wound and on Wimbley=s face was caused when gunpowder residue
penetrated Wimbley=s skin.  As Dr. Wilson explained, this indicates
that the gun used in the shooting was as close as five inches or as far away as
twenty-four or thirty six inches from Wimbley at the time he was shot.








Appellant
voluntarily surrendered himself to authorities after retaining counsel and was
tried for murder in January 2005.  Before trial, the trial court denied appellant=s motion to exclude
extraneous-offense evidence that he had intimidated Wimbley with a gun three
months before the murder.  Over defense counsel=s objections,
Quinton Goodwin testified that three months before the shooting, he drove
Wimbley to the apartment where Woodard then lived and saw appellant leave
Woodard=s apartment and
put the empty packaging from a television set in his truck.  According to
Goodwin, Wimbley approached appellant and spoke to him.  Goodwin testified that
appellant then opened the door of his vehicle, removed a black semi-automatic handgun,
and continued the conversation while holding the gun at his side in plain
view.  Goodwin said that Wimbley raised his hands with his palms facing
appellant and took about three steps back.  According to Goodwin, Wimbley and
appellant continued to speak for about thirty seconds before Wimbley lowered
his hands; the two men then spoke for another thirty seconds before Wimbley
returned to Goodwin=s car and left with him.  Goodwin said he
could not hear what either man said during the conversation.

The jury charge
included charges of murder and criminally negligent homicide and instructions
on self-defense, but the trial court denied appellant=s request to
include a charge for manslaughter.  During the jury=s deliberations
after each phase of trial, the jury asked to hear portions of testimony, and
the trial court overruled appellant=s objections to
the testimony read to the jury.

The jury found
appellant guilty of murder and after an initial deadlock assessed punishment at
ten years= confinement in the Institutional Division of the
Texas Department of Criminal Justice.  This appeal ensued.

II.  Issues Presented

Appellant presents
five issues for review.  In his first two issues, he challenges his murder
conviction on the grounds that the trial court improperly refused to charge the
jury on the lesser-included offense of manslaughter and failed to instruct the
jury to limit its consideration of extraneous-offense evidence.  In his third
issue, he contends the trial court committed reversible error by failing to
instruct the jury to disregard the State=s improper closing
arguments.  Appellant argues in his fourth issue that the trial court abused
its discretion in selecting testimony to read to the jury in response to its
requests.  Finally, appellant contends in his fifth issue that the trial court
abused its discretion by refusing to allow defense counsel to question him a
third time during the guilt/innocence phase of trial. 








Appellant also
presents two contingent requests in which he asks that if we overrule each of
the issues presented and deny his request for a new trial, then we (a) abate
the appeal, remand the case to the trial court, order a hearing permitting
appellant to make an offer of proof, and direct the trial court to forward the
offer of proof to this court, or (b) remand the case and direct the trial court
to supplement the record with a copy of the Allen[4]
charge given at trial.   

III.  Analysis

A.      Requested Manslaughter Charge      

In his first issue, appellant contends the trial court
erred by denying his requested jury 

charge on
manslaughter as a lesser-included offense.  We employ a two-part test to
determine whether a charge on a lesser-included offense was required.  Feldman
v. State, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002).  First, we must decide
whether the offense is actually a lesser-included offense of the offense
charged.  Id.  Second, we must conclude there is some evidence in the
record that would permit a rational jury to find the defendant guilty only of
the lesser offense.  Id.  A lesser-included offense is not required
solely because Athe jury may disbelieve crucial evidence
pertaining to the greater offense, but rather, there must be some evidence
directly germane to the lesser-included offense for the finder of fact to
consider before an instruction on a lesser-included offense is warranted.@  Hampton v.
State, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003) (en banc) (citing Skinner
v. State, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)).








There is no
question here that the first prong of the test is satisfied: it is
well-established that manslaughter is a lesser-included offense of murder.  Girdy
v. State, 213 S.W.3d 315, 318B19 (Tex. Crim.
App. 2006); Moore v. State, 969 S.W.2d 4, 9 (Tex. Crim. App. 1998) (en
banc).  The only difference between the two offenses is the mental state
required.  Ross v. State, 861 S.W.2d 870, 875 (Tex. Crim. App. 1992) (en
banc).  Murder is statutorily defined as intentionally or knowingly causing the
death of an individual.  Tex. Penal Code
Ann. _ 19.02(b)(1) (Vernon 2006).  A person acts
intentionally, or with intent, with respect to the nature of his conduct or to
a result of his conduct when it is his conscious objective or desire to engage
in the conduct or cause the result.  Id. ' 6.03(a).  A
person acts knowingly with respect to a result of his conduct when he is aware
that his conduct is reasonably certain to cause the result.  Id. ' 6.03(b).  In
contrast, manslaughter is defined as recklessly causing the death of an
individual.  Id. _ 19.04(a).  A person acts recklessly with respect to
circumstances surrounding his conduct or the result of his conduct when he is
aware of but consciously disregards a substantial and unjustifiable risk that
the circumstances exist or the result will occur.  Id. ' 6.03(c). 

Applying these
definitions, the second prong of the test is satisfied if there is some
evidence from which a rational jury could find that appellant consciously
disregarded the substantial and unjustifiable risk that his conduct would cause
Wimbley=s death, rather
than finding that (1) it was appellant=s conscious
objective or desire to cause Wimbley=s death, or (2)
appellant was aware that his conduct was reasonably certain to cause Wimbley=s death.  See
Feldman, 71 S.W.2d at 750B51.  Appellant argues that this test is
satisfied because his testimony indicated that he did not intend to kill
Wimbley:  

Defense:      At what point did you
decide to fire the weapon?

Appellant:     Erica was standing between the ajarred (sic) door and
myself, and he was still trying to get in.  My back was up against the wall in
the foyer.  He grabbed the door handle and pulled it in to push the door ajar
with more force.  At the time when he had closed the door, I was reaching for
the flip bar latch to open the door to get out of there, but I didn=t get a chance to
open the flip bar latch because as soon as I reached up for it, I had the
firearm in my left hand.  And as soon as I reached up for it, the door flung
open and I feltCand the gun went off, and the door closed.








Appellant argues
that testimony such as this creates an inference that the gun discharged
accidentally.  But this argument relies on isolated statements taken out of
context and gives Ameaning to appellant=s statement[s]
that appellant did not.@  See Godsey v. State, 719 S.W.2d
578, 584 (Tex. Crim. App. 1986) (en banc).  Fragments of testimony Acannot be plucked
out of the record and examined in a vacuum.@  Id. 
Here, any inference that the gun discharged accidentally is negated by
appellant=s testimony on cross-examination describing his state
of mind:

State:           And your testimony
is you jumped and the gun went off, correct?

Appellant:     Yes, ma=am - - yes, sir.

State:           Now, did you
intentionally or knowingly fire that gun at Ken Wimbley?

Appellant:     Yes, sir.

State:           So, it wasn=t an accident that you shot him,
correct?

Appellant:     No, sir.

State:           So, when you say
you jumped and the gun went off, that isn=t exactly right, is it?

Appellant:     Yes, sir, that=s right.

State:           Well, you jumped. 
Did you pull the trigger when you jumped?

Appellant:     Yes, sir.

State:           Were you aiming at
him when you jumped?

Appellant:     No, sir.

State:           So, did you intend
to hit him?

Appellant:     No, sir.

State:           So, you
intentionally fired the gun or was it an accident when you jumped?

Defense:      Objection, Your
Honor.  Asked and answered.

Court: Overruled.

Appellant:     Repeat the question.

State:           Did you
intentionally fire that gun or did it accidentally go off when you jumped?

Appellant:     I intentionally
fired the gun.

State:           But your testimony
is you did not intentionally fire it at Ken Wimbley; is that right?

Appellant:     Yes, I did.

State:           So, you shot him
and you meant to do it, right?

Appellant:     Yes, sir.       

 








Appellant also
testified that he knew the gun was loaded, and that the gun had a Adouble safety that
kept you from pulling the trigger unless you took both of them off.@  According to
appellant, A[o]ne was a flip bar on the side, and the other was a
palm safety where you had to hold the gun and take the other one off to be able
to fire the firearm.@

In sum, the
evidence does not raise the issue of manslaughter.  To raise this issue, there
must be evidence of a lack of intent to kill and evidence that the accused
acted recklessly while ignoring a known risk.  Munoz v. State, 932
S.W.2d 242, 245 (Tex. App.CTexarkana 1996, no pet.).  The appellant=s denial that he
intended to kill the victim does not, of itself, raise the issue of
manslaughter.  Id.  To the contrary, when Aa deadly weapon is
used in [a] deadly manner, the inference is almost conclusive that [the
appellant] intended to kill . . . .@  Godsey,
719 S.W.2d at 581 (quoting Hatton v. State, 31 Tex. Crim. 586, 21 S.W.
679 (1893)).  In the absence of other evidence, the jury may presume intent to
kill from the use of a deadly weapon.  Munoz, 932 S.W.2d at 245.  Thus,
courts have typically found that a manslaughter instruction was required based
on some evidence that the gun discharged accidentally or that the defendant
only intended to frighten the complainant.  See, e. g.,
Trujillo v. State, BS.W.3dB, 2006 WL 3752163
(Tex. App.CHouston [1st Dist.] Dec. 21, 2006, pet. filed)
(defendant indicted for murder was charged and convicted of manslaughter based
on evidence that he was brandishing a loaded gun to frighten pursuers when the
gun accidentally discharged).  Given the state of the entire record, appellant=s isolated statements
that he was not aiming at Wimbley and did not intend to kill him do not
constitute evidence upon which a jury could rationally find that appellant=s actions were
merely reckless.  See Mathis v. State, 67 S.W.3d 918, 926 (Tex. Crim.
App. 2002).   We therefore overrule appellant=s first issue.

B.      Limiting Instructions on the Use of Extraneous-Offense Evidence
         








In his second
issue, appellant contends the trial court erred during the presentation of
evidence and in its submission of the jury charge by failing to instruct the
jury to limit the purposes for which it considered Quinton Goodwin=s extraneous-offense
evidence.  Approximately three months before trial, appellant filed a written
objection to the admission of extraneous-offense evidence and requested
limiting instructions if the trial court admitted the evidence.  Although
appellant moved to exclude this evidence at trial, he did not request a
limiting instruction when the evidence was admitted or when the jury was
charged.  

The Court of
Criminal Appeals has consistently held that a party opposing the admission or
unrestricted use of evidence has the burden of objecting and requesting a
limiting instruction when the evidence is introduced.  See, e.g.,
Hammock v. State, 46 S.W.3d 889, 894 (Tex. Crim. App. 2001); Garcia
v. State, 887 S.W.2d 862, 877 (Tex. Crim. App. 1994) (en banc).  If a
limiting instruction is not requested when the evidence is introduced, then it
is admitted for all purposes.  Garcia, 887 S.W.2d at 877.  Because
appellant did not request a limiting instruction when Goodwin testified, his
testimony was admitted for all purposes.  Consequently, there were no grounds
for including a limiting instruction in the jury charge.  See Hammock,
46 S.W.3d at 895.  Accordingly, we overrule appellant=s second issue.

C.      Improper Argument 

In his third
issue, appellant contends the trial court erred Aby not correcting
instances of improper argument@ by the State.  The first alleged instance
occurred during the State=s closing argument in the guilt/innocence
phase of trial.  In support of its theory that appellant chased Wimbley as
described by C.L. and Perry, the State argued that if appellant shot Wimbley Abetween that door
with a person in between them, that stippling would have disbursed [sic] before
it hit him.@  The trial court overruled defense counsel=s objection that
the State was arguing outside the record. 








Argument to the
jury may properly include reasonable deductions from the evidence.  See Hughes
v. State, 878 S.W.2d 142, 157B58 (Tex. Crim.
App. 1992) (en banc); Gaddis v. State, 753 S.W.2d 396, 398 (Tex. Crim.
App. 1988); Carter v. State, 614 S.W.2d 821, 823 (Tex. Crim. App.
1981).  Here, a medical examiner testified that the stippling was caused by gun
powder residue that penetrated the skin, and established that the gun was no
more than thirty-six inches from Wimbley when he was shot.  According to
Woodard=s testimony,
appellant fired the gun, propelling the bullet (and presumably, gun powder
residue) through an opening only four to six inches wide at a time when the
space was at least partially blocked by Woodard.  But according to the autopsy
report, stippling was found on Wimbley=s neck and face. 
The stippling on his face covered Aan eight by six
area.@[5]  We therefore
conclude the State reasonably deduced that if the shooting occurred as the
defense contends, then powder would have dispersed over Woodard, the door, and
the door frame, leaving an area of stippling on Wimbley=s body smaller
than the four-to-six-inch opening of the door.

Appellant also
complains of the following italicized statements during the State=s rebuttal
argument in the punishment phase of trial:

State:           I want to address
a couple of issues that Defense counsel brought up just to avoid some
confusion.  If you assess, which I don=t think is appropriate, if you were to assess community
supervision, you don=t haveCyou just determine the number of
years.  The Judge determines what those terms and conditions are.  So, you have
no guarantee as to what the Judge would assess in that condition.

Also, in America, we don=t have a debtor=s prison.  And that=s the same thing for somebody on
community supervision.  If they don=t pay their fees, if they don=t pay child support, if they don=t pay to support a dependent, the
State can=t revoke them just for financial
reasons.  So, even if the Judge were to assess that and he doesn=t pay, there is nothing the State
can do about it.

Defense:      Objection, Your
Honor.  Improper argument.

Court: Ladies and gentlemen of the
jury, the Court can order certain fees to be paid as well as certain
restitution to be paid.  If the person charged does not pay those, the State
has to show the ability to pay before the Court can do anything.

Defense       Thank you, Your
Honor.  May we ask that the jury disregard the State=s statement?

Court: The jury has been
instructed.  Overruled.

Defense:      Thank you. 

 








Both explanations
of the law in the above exchange are incorrect: when the State seeks to revoke
a defendant=s community supervision for failure to make
court-ordered payments, the State bears the initial burden to prove that the
failure to pay was intentional, and the defendant bears the burden to prove
inability to pay.  See Tex. Code
Crim. Proc. Ann. art. 42.12 ' 21(c) (Vernon
2006); Stanfield v. State, 718 S.W.2d 734, 737B38 (Tex. Crim.
App. 1986) (en banc).  Because this error is nonconstitutional, however, we
will disregard it if it does not affect appellant=s substantial
rights. Tex. R. App. P. 44.2(b). 


A substantial
right is affected when the improper jury argument has a substantial and
injurious effect or influence on the jury=s verdict.  Simpson
v. State, 119 S.W.3d 262, 266 (Tex. Crim. App. 2003).  To determine whether
an improper jury argument is harmful, we consider (1) the severity of the
misconduct or prejudicial effect, (2) any curative measures taken, and (3) the
certainty of conviction or punishment assessed absent the misconduct. Martinez
v. State, 17 S.W.3d 677, 692B93 (Tex. Crim.
App. 2000) (en banc).     

Appellant points
out that the jury was initially deadlocked between those jurors who thought
community supervision was appropriate and those that recommended imprisonment. 
Appellant argues that the erroneous statements of law likely broke the deadlock
and caused the jury to sentence him to confinement.  We disagree. 

First, there is no
evidence in the record to support a supposition that the jury believed
appellant would not pay any court-ordered fees or debts.  The uncontroverted
evidence at trial established that although there is no court order directing
him to support his child by Woodard, appellant voluntarily pays all of the
child=s daycare
expenses, all of his health insurance, and pays Woodard an additional two or
three hundred dollars a month for any other expenses.  Because the evidence is
uncontroverted that appellant was willing and able to support his child without
the necessity of a court order, the jury would have no reason to infer that
appellant would be unwilling or unable to pay court-ordered fees or to support
Wimbley=s children if
ordered to do so as a condition of probation.  Consequently, we cannot say that
the misstatement had a prejudicial effect.  








Moreover, the
improper statements of law were brief and addressed a tangential aspect of
community supervision: that of revocation of community supervision for failure
to pay fees or debts.  In an effort to cure the State=s
misrepresentation of the law, the trial court attempted to instruct the jury on
the governing law, and this curative instruction contained another
misstatement.  Appellant argues that, in effect, no curative instructions were
given because the trial court=s statement of the law was incorrect.  But
the law as stated by the trial court is more favorable to a probationer than
the governing law.  The trial court accurately stated that the State bears the
initial burden of proof, but misstated the fact that must be proved.  The State
must first prove that the defendant intentionally violated a condition of
community supervision; because inability to pay is an affirmative defense, the
State need not prove ability to pay unless the defendant first raises that
defense.  In addition, appellant=s ability to pay
any court-ordered fees or child support was never called into question.  Thus,
even if the error were potentially prejudicial, the curative instructions,
although incorrect, were sufficient to cure any prejudice.

Finally, it is
unlikely that these misstatements caused the jury to sentence appellant  to
confinement rather than community supervision.  The defense=s key argument in
favor of community supervision was that it would be better for appellant, the
State, and Wimbley=s survivors if appellant remained in the
community to support Wimbley=s children:

So, why then should you give him
probation?  Why?  Well, I=m going to tell you why.  Because
if you send him to prison, there will be not only two children now without a
father, not only four children now without support, but six.  Six children. 
So, how then would society benefit from you placing David Arnold on community
supervision?  I=m going to tell you how. 

You put him on community supervision and you hold him responsible to
Mr. Wimbley=s children.  Because they
don=t have a father to
support them now.  You make him support those children.  You make him work
for them, whether it be to pay them monthly support, whether it be to make
him start a college fund for them, the Judge has that discretion and he can do
it.  And he would be held responsible for that. . . . Make
him support the [sic] Wimbley=s children.








(emphasis added). 
As this excerpt illustrates, the defense primarily asked the jury to make
appellant support Wimbley=s children and spoke of community
supervision as an incidental condition necessary to implement that Asentence.@  But as the State
correctly pointed out, the jury does not have the power to impose such a
requirement.  To the contrary, the conditions of community supervision are
determined by the trial court, not by the jury.  Consequently, there is no reason
to suppose that the jury=s rejection of community supervision was
based on the burden of proof at a hypothetical revocation hearing rather than
on the knowledge that it had no power to impose the conditions urged by the
defense.  

Based on our
review of the record, we are persuaded that the misstatements of law by the
State and the trial court did not have a substantial effect on appellant=s rights, and did
not have an injurious effect on the jury=s assessment of
punishment.  We therefore overrule appellant=s third issue.

D.      Testimony Read to the Jury

In his fourth
issue, appellant contends the trial court abused its discretion by selecting
certain portions of testimony to be read to the jury in response to its
requests.  If jurors disagree about the testimony of any witness, the jury may
apply to the trial court to Ahave read to them from the court reporter=s notes that part
of such witness testimony or the particular point in dispute, and no other . .
. .@  Tex. Code Crim. Proc. Ann. art. 36.28
(Vernon 2006).  After determining that jurors dispute a portion of testimony,
the trial court must strike a balance between reading too much or too little
testimony in response to the jury=s requst.  See,
e.g., Jones v. State, 706 S.W.2d 664, 668 (Tex. Crim. App. 1986) (en
banc) (holding that the trial court abused its discretion by failing to have
cross-examination testimony related to the disputed issue read to the jury); Pugh
v. State, 376 S.W.2d 760, 761B62 (Tex. Crim.
App. 1964) (holding that the trial court erred when, in response to the jury=s request for
testimony regarding the date and time of the incident, it caused the entirety
of the arresting officer=s testimony to be read).  We review the
trial court=s rulings on the jury=s request to
review testimony for an abuse of discretion.  Jones, 706 S.W.2d at 667. 








Appellant first
complains of the trial court=s response to the following jury request:

Name of witness whose statement is
subject to disagreement: 

David Arnold

Lawyer questioning witness at time
of statement: 

Charles Thompson (for the State)

Statement in Dispute:

ADid you knowingly and intentionally
shoot Kenneth Wimbl[e]y?@

AYes@

In response, the
trial court had the following testimony read to the jury:

Question:     Now, did you
intentionally and knowingly fire that gun at Ken Wimbley?

Answer:       Yes, sir.   

Defense counsel
objected to this selection on the grounds that this testimony is not responsive
to the question asked by the jury and requested that the jury hear a longer
portion of the transcript consisting largely of the excerpt quoted in our
discussion of appellant=s first issue.  The trial court overruled
the objection.  

Because the
statement in dispute is phrased in the second person and uses quotation marks
for the question and answer, the trial court did not abuse its discretion in
concluding that jurors disputed whether a specific question was asked and was
answered in the affirmative.  Given the jury=s specific and
limited request, there was no basis for the trial court to cause additional
testimony to be read to the jury.  To the contrary, the testimony selected by
the trial court is the only question and answer responsive to the jury=s request; thus,
the material that was read to the jury appropriately consisted of Athat part of such
witness testimony or the particular point in dispute, and no other . . .
.@  See Tex. Code Crim. Proc. Ann. art. 36.28
(Vernon 2006) (emphasis added). 

Appellant next
challenges the trial court=s choice of material to be read to the
jury in response to the following request:

Name of witness whose statement is
subject to disagreement: 

[C.L.]

Lawyer questioning witness at time
of statement: 

Mrs. [Quinones] (Defense)








Statement in Dispute:

1) Statement of Ken telling him Athere=s going to be trouble@ to Ahe turned the corner and I heard
the shot@

CalsoC

2) Who did he see on [the] upper
floors of building #8

 

Concerning the
first question, the trial court informed the attorneys that it could not find
the quoted portions, AThere=s going to be
trouble[@] and [A]he turned the
corner.@  In response to
the second question, the trial court ordered the following testimony by C.L. to
be read to the jury:

Question:     And you saw Mr.
Wimbley on the third floor balcony; isn=t that correct?

Answer:       Yes, ma=am.

Question:     Okay.  And after you
saw Mr. Wimbley, you saw another man, didn=t you, [C.L.]?  

Answer:       Yes, ma=am.

Question:     And you weren=t able to identify who that man
was?

Answer:       No, ma=am.

Question:     And he was also on
the third floor, wasn=t he?

Answer:       Yes, ma=am.  

Appellant contends
that the trial court=s selection of this testimony amounts to a
comment on the evidence because the following testimony regarding the
unidentified man was excised from this portion of C.L.=s testimony:[6]

Question:     And, in
fact, that man was carrying a gun, wasn=t he?

Answer:       Yes, ma=am.

Question:     He was
carrying a black and silver gun, wasn=t he?

Answer:       Yes, ma=am.








We conclude that
the trial court did not abuse its discretion by omitting this testimony because
this material is not responsive to the jury=s request.  The
jury requested C.L.=s testimony stating who he saw on
the upper floors of the building, not what he saw.  When the jury
requests the reading of only a specific and limited portion of testimony, the
trial court does not abuse its discretion by providing only the requested
information.  See id.; Robison v. State, 888 S.W.2d 473,
481 (Tex. Crim. App. 1994) (en banc). 

Appellant also
challenges the trial court=s response to this request:

Name of witness whose statement is
subject to disagreement: 

[C.L.]

Lawyer questioning witness at time
of statement: 

Mrs. [Quinones]

Statement in Dispute:

His testimony
about when Ken spoke to him until when he heard the shot

In response to
this request, the trial court ordered the following excerpt to be read to the
jury:

Question:     Now, prior to you
seeing Mr. Arnold, that is when Mr. Wimbley told you, AStay right here, I don=t want you to get hurt.@  Isn=t that true?

Answer:       Yes, ma=am.

Question:     That=s after you saw the unidentified
black man and after you saw Mr. Wimbley; isn=t that true?

Answer:       Yes, ma=am.

Question:     And at no time when
you saw Mr. Wimbley did he ever say, >[C.L.], call the cops.  I=m being chased,= did he? 

Answer:       No, ma=am.

Defense:      May I have a moment,
Your Honor?

Court: Yes, ma=am.

Defense:      I=ll pass the witness at this time, Your
Honor.

Appellant contends
this material did not fairly meet the scope of the jury=s request for
testimony but is instead a comment on the weight of the evidence.  We
disagree.  The jury requested testimony that the defense elicited from C.L.
during cross-examination regarding his conversation with Wimbley; this excerpt
begins with that testimony.  The jury asked for all of C.L.=s
cross-examination testimony regarding that conversation, ending with C.L.=s testimony that
he heard a shot.  During his cross-examination, C.L. was not asked about
gunfire, and thus, did not repeat his earlier testimony about hearing two
gunshots.  Accordingly, the trial court produced all of C.L.=s
cross-examination testimony regarding his conversation with Wimbley.  The
material read to the jury is responsive to its request and does not represent a
comment on the weight of the evidence.  








We conclude the
trial court did not abuse its discretion in selecting any of the challenged
material to be read to the jury in response to its requests.  We therefore
overrule appellant=s fourth issue.

E.      Second Re-Direct Examination

In his fifth
issue, appellant contends the trial court erred by refusing to allow his
defense counsel to conduct a second re-direct examination of him during the
guilt/innocence phase of trial.  This issue has not been preserved for review
because appellant did not object at trial or make an offer of proof or bill of
exception.  Tex. R. App. P. 33.1(a),
33.2;  Guidry v. State, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999) (error
in the exclusion of evidence may not be claimed unless the proponent perfects
an offer of proof or a bill of exceptions).  Accordingly, we overrule appellant=s fifth issue.

F.       Requests for Abatement or Remand

Having overruled
each of the five issues presented, we now reach appellant=s two contingent
requests for abatement or remand.  Appellant first points out that  the trial
court refused to allow him to make an offer of proof or bill of exception to
preserve error.  Specifically, defense counsel cross-examined Woodard regarding
her relationships with other men over the eleven-year period that she had known
appellant and asked her, AWhy did you stop dating Derrick?@  The trial court
sustained the State=s objection to the relevance of this
information, but refused to allow defense counsel to make an offer of proof. 
Appellant asks that, if we overrule all of his issues on appeal, we
nevertheless remand the case to the trial court, order a hearing to allow
appellant to make an offer of proof, and direct the trial court to forward the
record of this evidence to this court.  In addition, appellant asks that, if we
overrule all of appellant=s issues that seek a new trial, we remand
the case to the trial court for the supplementation of the record Awith an accurate
copy of the Allen charge given at trial.@








We deny these
requests for several reasons.  First, appellant does not contend that any
evidence that might be added to the record is relevant to our determination of
the issues presented on appeal.  See Tex.
R. App. P. 34.5(c)(1) ( addressing supplementation of the clerk=s record A[i]f a relevant
item has been omitted@) (emphasis added); Tex. R. App. P. 34.6(d) (addressing
supplementation of the reporter=s record A[i]f anything relevant
is omitted@) (emphasis added).  Thus, remanding the case for
supplementation would be a useless gesture.[7] 
See Rivera v. State, 981 S.W.2d 336, 341 (Tex. App.CHouston [14th
Dist.] 1998, no pet.).  Moreover, appellant asks that we reach these requests
onlyA[i]n the event the
Court does not grant Appellant a new trial based on the errors raised in [in
the five issues presented on appeal].@  But after
overruling all of appellant=s issues, nothing is left for our review. 
Appellant has not asked to file an amended or supplemental brief, and we are
not required to consider issues that were not raised in his original brief.  See
Tex. R. App. P. 38.1(e); Garrett
v. State, BS.W.3dB, 2007 WL 1217220, at *2 (Tex. Crim. App.
April 25, 2007).  Appellant has identified no purpose that would be served by
supplementing the record, and does not contend that we would have occasion to
review the additional materials.  Finally, appellant does not allege that he
was harmed by the omission of these materials, nor have we independently
discovered any resulting prejudice to appellant.  For each and all of the
foregoing reasons, we deny appellant=s requests for
abatement and remand.

IV.  Conclusion








We hold the trial
court did not abuse its discretion by denying appellant=s request to
include the offense of manslaughter in the jury charge because a rational jury
could not find appellant guilty of only the lesser-included offense.  We
further hold appellant waived his complaint about the lack of limiting
instructions regarding the use of extraneous-offense evidence and failed to
preserve error, if any, arising from the trial court=s refusal to allow
defense counsel to question appellant a third time.  We conclude the trial
court did not err in overruling appellant=s objection to the
State=s closing argument
during the guilt/innocence phase of trial.  Although the State and the trial
court misstated the law during the punishment phase of trial, we conclude that
these errors were harmless.  Finally, we hold the trial court did not abuse its
discretion in selecting portions of witness testimony to be read to the jury in
response to its requests.  Because nothing further remains for our review, we
deny appellant=s contingent requests for abatement or remand and
affirm the trial court=s judgment.

 

 

 

 

/s/      Eva M. Guzman

Justice

 

 

Judgment rendered
and Opinion filed June 14, 2007.

Panel consists of
Justices Frost, Seymore, and Guzman.

Publish C Tex. R. App. P. 47.2(b).









[1]  In the written statement Woodard gave police that
night, Woodard stated that the shooting occurred entirely outside of her
apartment and she learned what had happened only after she heard a noise
outside.  She did not mention that the shooting occurred at her door.  At
trial, Woodard said that she was not in her Aright
mind@ at the time she gave that statement, but was telling
the truth in court.  She also admitted that she was still seeing appellant, and
that she gave the Grand Jury a third version of events in which the shooting
took place inside her apartment. 





[2]  C.L. knew Wimbley because he came to most of C.L.=s football practices.





[3]  Conflicting evidence was offered regarding whether
Woodard lived on the first or the second floor of Building No. 8 of the
apartment complex.





[4]  An Allen charge is given to instruct a
deadlocked jury to continue deliberating.  See Allen v. United States,
164 U.S. 492, 501, 17 S. Ct. 154, 157, 41 L. Ed. 528 (1896). 





[5]  This description is found in the autopsy report.





[6]  This testimony immediately preceded the question A[a]nd he was also on the third floor, wasn=t he?@ 





[7]  Remand for supplementation with the Allen
charge would be futile for an additional reason.  The clerk of the trial court
has attested that no copy of the charge has been found, and we will not remand
a case for supplementation under such circumstances.  See, e.g., Francis
v. State, 132 Tex. Crim. 591, 593, 106 S.W.2d 279, 280 (1937) (upholding
trial court=s denial of appellant=s request for an order that was impossible for the court reporter to
fulfill).