NUMBER 13-10-00124-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG 
                                                                                                                      
 
MICHAEL ANTHONY MANCHA,                                                Appellant,

v.
 
THE STATE OF TEXAS,                                                               Appellee.
                                                                                                                      

On appeal from the 139th District Court 
of Hidalgo County, Texas.
                                                                                                                       

MEMORANDUM OPINION

Before Justices Garza, Benavides, and Wittig



Memorandum Opinion by Justice Wittig
          Appellant, Michael Anthony Mancha, age sixteen at the time of the homicide, was
certified as an adult. He was indicted on three counts of the capital murder of Miguel
Cahue. Mancha pled not guilty but the jury found him guilty of the lesser-included offense
of murder, and assessed his punishment at ninety-nine years at the Institutional Division
of the TDCJ. Notice of appeal was timely filed. In a single issue, Mancha argues the trial
court abused its discretion by denying his request for inclusion of the lesser-included
offense of manslaughter in the jury charge. We reverse and remand.
                                                     I. Background 
          Hazael (Ozzy) Gonzales, eighteen, and Joel (Jay) Salinas owed a lot of money to
several loan agencies and had fallen behind in payments. Ozzy came up with a plan to rob
Cahue, seventy-four, who lived across from the park at a McAllen trailer park. In
preparation for the robbery, Wendy Gomez, fourteen, went to the Wal Mart store and stole
some latex gloves and duct tape. Wendy knew Mancha but was closer to Ozzy. Ozzy in
turn was closer to Mancha. Ozzy knew that Cahue liked to have sex with young boys. 
They planned to take a couple young males to visit Cahue, and gain access to his trailer
home. Cahue was thought to have money and have some “good stuff” to steal. Ozzy and
Jay were joined by Wendy’s brothers Alfredo Gomez and Marvin Gomez, ages nineteen
and sixteen, respectively. Jose de Jesus Martinez, seventeen, and Mancha completed the
group. 
          The teens went to Cahue’s trailer once but decided it was too late so they returned
August 6, 2008. They brought with them duct tape, latex gloves, and a BB gun. Mancha
and Alfredo initially held Cahue on the floor, while their cohorts searched for items to steal. 
Alfredo held Cahue’s legs and Mancha sat on his upper body, placing a sweater over his
head. Cahue yelled at his captors and struggled to free himself, kicking and scratching. 
Cahue’s daughter described her father as fit, able to defend himself, native Chicagoan,
who lifted weights. Alfredo at some point turned Cahue over to Mancha while Alfredo then
helped the others search the trailer for valuables. Jose, one of the State’s eye-witnesses,
testified Mancha hit Cahue in the face with his hand. He did not see Mancha strike Cahue
with any object. Jose said Wendy kicked Cahue. Another State witness, Marvin, testified
he saw Mancha hold Cahue’s hands, cover his face with a gray sweater, and strike Cahue 
with a candleholder. Wendy hit Cahue three times and “stomped him on the butt” two
times, according to Marvin. The episode took about ten to fifteen minutes according to
Marvin, and thirty minutes according to other testimony. During the ten to fifteen minute
episode, Mancha was “holding the man down.”          Before testifying, Marvin, also
charged with capital murder, entered into a plea bargain for a reduced charge and five
years in the penitentiary. Similarly, Jose had his capital murder charges reduced and pled
to receive five years in the penitentiary. These two accomplices were the primary
witnesses for the State.
          Mancha’s statement to police, admitted into evidence, stated he met with Marvin,
Alfredo and Wendy. Wendy told of two “gay guys” who knew a “greedy old man” who hung
out at the park and had money. The two guys would take the group to the man’s trailer. 
Alfredo went in first because Cahue thought he was going to have sex with him.


 Later
Mancha went in and told Cahue to lay down on the ground, but he would not listen, so
Mancha, one-hundred-and-ten pounds, grabbed the larger man and knocked him to the
floor. While Cahue was being held, he kept struggling, grabbing Mancha’s neck “. . .and
I kept holding on to the old man trying to calm him down.” The statement continued,
Wendy walked up to Mancha and Cahue and kicked Cahue in the face, but not too hard. 
Cahue started struggling again and put his hand in the back of Mancha’s pants. Mancha
punched him some more in the face and head. Cahue was bleeding a lot from the head
and face. When the robbery was complete, they grabbed Cahue by his arms and dragged
him to the bathroom and left him there. When Mancha left Cahue, he was breathing and
Mancha did not think he was going to die. Mancha stated he was not going to kill Cahue. 
Afterwards, the group went to the park and then behind Wendy’s apartment where they
burned the sweater and latex gloves used in the robbery. Mancha’s statement was
detailed and extensive.
           According to other testimony, when the group left, some were afraid Cahue would
come after them while some were not afraid. When officers arrived on August 8, 2008, the
television and air conditioning were both on and there were blood stains on the carpet. 
The door next to the bedroom was locked but was opened with a set of keys located in the
trailer. The pathologist found lacerations to Cahue’s head around the left and right
eyebrow, a bruise on his right forehead, small scrapes on his right hand and right knee,
and bruising on his right calf. The pathologist’s internal exam showed extensive bruising
along the chest wall, rib fractures, as well as discoloration to the back and back of his
head. The pathologist opined that the cause of death was blunt force head and chest
trauma and either set of injuries was sufficient to have killed Cahue.
                                                     II. Standard of Review
          Our first duty in analyzing a jury charge issue is to decide whether error exists. Ngo
v. State, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005) (citations omitted). If we find
error, we analyze that error for harm. Id. The degree of harm necessary for reversal
depends on whether the appellant preserved the error by objection. Id. Under Almanza,
jury charge error requires reversal when the defendant has properly objected to the charge
and we find "some harm" to his rights. Id. (citing Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1985)). Thus, we review alleged charge error by considering two
questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted
from the error to compel reversal. Id. 
                                                     III. Charge Error
          The State does not contest that Mancha timely requested a jury instruction for the
lesser-included offense of manslaughter. The trial court refused to give the instruction. 
To determine whether a charge on a lesser-included offense should be given, the court of
criminal appeals has implemented a two-step test. Mathis v. State, 67 S.W.3d 918, 925
(Tex. Crim. App. 2002) (citing Aguilar v. State, 682 S.W.2d 556, 558 (Tex. Crim. App.
1985); Royster v. State, 622 S.W.2d 442, 444 (Tex. Crim. App. 1981) (plurality opinion)).
The first step is to decide whether the offense is a lesser-included offense of the offense
charged. Id.; Tex. Code Crim. Prod. Ann. art. 37.09 (Vernon 2008); see also, e.g.,
Rousseau v. State, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); Aguilar, 682 S.W.2d at
558. The courts have recognized that manslaughter is a lesser-included offense of capital
murder. See Cardenas v. State, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000). 
Therefore, the first prong of the test is satisfied.
          The second step of the Aguilar/Rousseau test requires an evaluation of the
evidence to determine whether there is some evidence that would permit a jury to rationally
find that the defendant is guilty only of the lesser offense. Mathis, 67 S. W.3d at 925 (citing
Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); Rousseau, 855 S.W.2d at 672)). 
“In other words, there must be some evidence from which a jury could rationally acquit the
defendant of the greater offense while convicting him of the lesser-included offense.” Id.
(citing Moore, 969 S.W.2d at 8). The evidence must establish the lesser-included offense
as a valid rational alternative to the charged offense. Id. (citing Wesbrook v. State, 29
S.W.3d 103, 113-14 (Tex. Crim. App. 2000)); see also Arevalo v. State, 943 S.W.2d 887,
889 (Tex. Crim. App. 1997).
          The only difference between murder and manslaughter is the mental state required.
Ross v. State, 861 S.W.2d 870, 875 (Tex. Crim. App. 1992) (en banc). Murder is
statutorily defined as intentionally or knowingly causing the death of an individual. Tex.
Penal Code Ann. § 19.02(b)(1) (Vernon 2008). A person acts intentionally, or with intent,
with respect to the nature of his conduct, or to a result of his conduct, when it is his
conscious objective or desire to engage in the conduct or cause the result. Id. § 6.03(a). 
A person acts knowingly with respect to a result of his conduct when he is aware that his
conduct is reasonably certain to cause the result. Id. § 6.03(b). In contrast, manslaughter
is defined as recklessly causing the death of an individual. Id. § 19.04(a). A person acts
recklessly or is reckless with respect to circumstances surrounding his conduct, or the
result of his conduct, when he is aware of, but consciously disregards, a substantial and
unjustifiable risk that the circumstances exist or the result will occur. Id. § 6.03(c); Arnold
v. State, 234 S.W.3d 664, 671 (Tex. App.–Houston [14th Dist.] 2007, no pet.).
          Murder is a "result of conduct" offense, which means that the culpable mental state
relates to the result of the conduct, the causing of the death. Schroeder v. State, 123
S.W.3d 398, 400-01 (Tex. Crim. App. 2003). The fact finder would have to conclude that
Mancha recklessly caused Cahue’s death. Tex. Penal Code Ann. § 19.04.
          A manslaughter charge is required if there is any evidence from which a jury could
conclude the defendant did not intentionally or knowingly kill an individual, but consciously
disregarded a substantial and unjustifiable risk the result would occur. Lugo v. State, 667
S.W.2d 144, 147 (Tex. Crim. App. 1984). "[A] defendant may be shown to be guilty only
of the lesser offense if the evidence presented is subject to different interpretations." 
Saunders v. State, 840 S.W.2d 390, 392 (Tex. Crim. App. 1992) (holding that the mental
state was shown circumstantially; no direct evidence was presented regarding appellant's
intent to kill or injure, his knowledge that death could result, or his awareness that a risk
of death existed; evidence simply showed that appellant had squeezed the back of the
baby's head fifteen days before the child's death, (whose death was likely caused by a
similar squeeze)). 
          “If there is evidence within a defendant's testimony which raises the lesser-included
offense, it is not dispositive that this evidence does not fit in with the larger theme of that
defendant's testimony.” Jones v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). 
“Whether there is evidence, within or without the defendant's testimony, which raised the
lesser-included offense controls the issue of whether an instruction on the lesser-included
offense should be given.” Id. So long as there is some evidence which is "directly
germane" to a lesser-included offense for the factfinder to consider, then an instruction on
the lesser-included offense is warranted. Id. (citations omitted).
          “The issue is not one of theoretical possibility, but one of whether, given all the
circumstances, it is reasonable to infer that the particular individual on trial was in fact
aware of the risk.” Dillon v. State, 574 S.W.2d 92, 95 (Tex. Crim. App. 1978). A
defendant, however, need not be aware of the specific risk of another's death in order to
commit manslaughter. Trepanier v. State, 940 S.W.2d 827, 829 (Tex. App.–Austin 1997,
pet. ref'd).
                                                     IV. The State’s Argument
          Citing Arnold, 234 S.W.3d at 672, the State initially argues that a defendant’s
isolated statement that he did not intend to kill does not constitute evidence upon which
a jury could rationally find his actions merely reckless. In Arnold, the defendant argued that
testimony created an inference that the gun discharged accidentally. Id. The court held
that the defense argument relied on isolated statements taken out of context and gave
interpretations to the appellant's statements that appellant himself did not give. Id. (citing
Godsey v. State, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986) (en banc)). “Fragments of 
testimony ‘cannot be plucked out of the record and examined in a vacuum.’” Id. Any
inference that the gun discharged accidentally was negated by the defendant’s testimony
on cross-examination describing his state of mind: 
State: And your testimony is you jumped and the gun went off, correct?
Appellant: Yes, ma'am – yes, sir.
State: Now, did you intentionally or knowingly fire that gun at Ken
Wimbley?
Appellant: Yes, sir.
State: So, it wasn't an accident that you shot him, correct?
Appellant: No, sir.
Id. While we agree that isolated statements out of context would not support a
manslaughter charge, such is not the case before us. First, the record here affords no 
evidence or admission of intent to murder. The State’s own witnesses said their intent was
to rob. Furthermore, as we discuss below, the contextual evidence, both direct and
circumstantial, supports an inference that the resulting death was caused recklessly, rather
than intentionally.
          Next, the State cites Wesbrook, 29 S.W.3d at 113. There, the appellant claimed the
trial court erroneously denied his request for a jury instruction on the lesser-included
offense of aggravated assault. Id. The only evidence supporting an aggravated assault
instruction came from appellant himself when he took the stand and, under direct
examination, admitted that he fired the rifle but denied he possessed any intent to kill the
five victims. Id. As the State argues, a defendant’s statement must be considered in the
context of the entire record to determine whether there was evidence from which the jury
could have concluded that the appellant was only guilty of manslaughter. See id. at 113-14. In Wesbrook, the trial record showed appellant acted intentionally, or at the least,
knowingly, when he walked into an apartment armed with a high-powered rifle. Id. at 112.
He fired a single shot at close range into the chest of the first victim, and continued to fire
the weapon, again at close range, into four more individuals, choosing as his target either
their head, chest, or abdomen. Id. Physical evidence from the scene and the condition
of the bodies suggest that one victim was shot as he attempted to escape from the
apartment and another was shot while on his knees. Id. The only contrary evidence that
this was not an intentional or knowing act was appellant's own assertion that he did not
intend to kill. Id. Given the entire record, this was not evidence from which a jury could
rationally conclude that appellant was guilty only of aggravated assault. Id. at 113-14
(citing Jackson v. State, 992 S.W.2d 469, 475 (Tex. Crim. App. 1999) (holding defendant
not entitled to instruction on the lesser-included offense of aggravated assault when
evidence showed appellant, at least, guilty of homicide). Although an instruction on
aggravated assault was given here, arguably Mancha was not entitled to one. See id. 
          Unlike Wesbrook, Mancha did not shoot multiple victims at close range with a high
powered rifle. We must consider the entire record where multiple participants indicated no
intent to kill and where Ozzy’s entire scheme, as well as that of his accomplices, was to rob
Cahue. Thus, Mancha’s statement of lack of intent to kill is corroborated by the express
intent of the others, the use of duct tape, a BB gun, and even the logical inference of the
pathologist’s testimony that blows to the chest by Wendy could have caused the death of
Cahue. “Either one could kill him, the head trauma or the chest trauma.”
          The State argues that Mancha’s statement that he “did not intend to kill the victim
but was only trying to restrain him,” is an interpretation that can only be reached if specific
aspects are taken out of context. However, in the context of Mancha’s statement, he told
Cahue to lie down on the ground. Mancha’s statement recited that Alfred told Cahue
several times to get down also but Cahue would not listen. Mancha grabbed Cahue and
knocked him down to the floor. He held Cahue who kept telling the group “stuff.” Mancha
had duct tape hidden in his sweater. “We were trying to tie him up and hold him down, but
he kept struggling with us.” While being held, Cahue bit Mancha on the left thumb. “I
punched him several times in the face to stop him from struggling but he would not stop.” 
Cahue kept grabbing Mancha’s neck and pinching him with his hands. “Alfred walked out
of the house and I kept holding on to the old man trying to calm him down.” Wendy walked
up and kicked Cahue in the face. Cahue starting struggling again and put his hand in the
back of Mancha’s pants. “I punched him some more in the face and head.” Cahue was
dragged to the back room. “When I left the old guy was still breathing. I did not think that
he was going to die.”
          We also note that the State focuses almost exclusively on certain isolated parts of
Mancha’s statement, rather than all of the contextual evidence we are required to consider. 
Enriquez v. State, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000) (stating that the appellate
court must examine the entire record instead of plucking certain evidence from the record
and examining it in a vacuum).
          The State next cites Mathis v. State, 67 S.W.3d 918, 925-26 (Tex. Crim. App. 2002). 
Like Wesbrook–indeed citing Wesbrook–the defendant shot multiple people. He killed one
with two shots to the head, including one shot to the back of the head, and shot a third
person between her eyes and yet still attempted to obtain a lesser charge of aggravated
assault. Id. (citing Wesbook, 29 S.W.3d at 103) (holding defendant not entitled to
instruction on the lesser-included offense of aggravated assault when evidence showed
appellant, at least, guilty of homicide)). Witnesses testified defendant’s actions were calm
and collected. Id. The defendant vacillated between insisting he had not aimed the gun
when shooting and stating that he had indeed aimed and shot:
I did not actually know at the time that I was – I was shooting [Almaguer]. I
did aim the gun and pull the trigger, but I never meaned [sic] – I just shot. I
never aimed it or anything. It just hit her. . . . I never said I didn't aim the gun
and pull the trigger. I have been telling you the whole time that I did aim the
gun and pull the trigger. . . . after they started hollering and screaming, then
I went in there and that's when I aimed and pulled the gun and pulled the
trigger. . . . I said I pointed the gun – I said I pointed it – I aimed – I didn't
mean to just point it. . . . I just pointed it and shot . . .. I just pointed the gun
and shot. I wasn't even really just looking . . . when I shot the gun, but I did
aim it over there. I wasn't never even looking . . . I just pulled the trigger. . .
. I just closed my eyes and shoot [sic].

Id. The evidence of the defendant’s actions reflected he was calm and calculating, not
panicked or frightened. Id. While claiming recklessness and no intent to kill, his own
testimony was inconsistent, for example he insisted he did not aim the weapon and yet
stating he did aim and shoot. Id. “Appellant's testimony that he did not intend to kill
anyone does not amount to evidence upon which a jury could rationally find appellant only
acted recklessly with respect to killing Hibbard, and not intentionally.” Id. Apart from the
defendant’s own testimony that he did not intend to kill anyone, there was no other
evidence in support of such theory, and “in fact the evidence refuted that testimony.” Id. 
The Mathis court concluded that the defendant’s testimony did not supply evidence upon
which a jury could rationally find appellant's actions toward Hibbard were merely reckless
and were not at least knowing. Id. (citing Jackson, 992 S.W.2d at 475). Mathis likewise
does not apply for several reasons. First, the requested lesser-included charge in this case
was manslaughter, not aggravated assault. Second, Mancha’s statement does not
vacillate between aiming a weapon and insisting he did not aim. The only arguable
inconsistency in the statement, as the State points out in its next argument, was Mancha’s
gratuitous statement he didn’t remember a lot.


 Third, Mancha was not armed with a high
powered rifle and did not shoot or kill multiple people or harm any other person. The
evidence did not even put the BB gun in his hands. Fourth, the State’s own witnesses
stated that their intent was to rob, and the plan to rob necessarily included restraining, but
not killing, Cahue. In context, Ozzy’s plan was designed and implemented as a robbery,
not a multiple homicide.
          Next, addressing the memory portion of Mancha’s statement, the State argues that
evidence of a defendant's inability to remember causing the death of the victim does not
entitle the defendant to a charge on the lesser-included offense of manslaughter, citing
Schroeder, 123 S.W.3d at 401. In Schroeder, the defendant testified that although he
remembered the events leading up to the shooting, he suddenly “blacked out” and had no
recollection of actually shooting the victim. Id. By his own admission, he was not aware
that he caused the victim's death at the time of the shooting. Id. 
The court of appeals’ reliance on the cited cases involving reckless conduct
is misplaced simply because those cases do not involve defendants who
were completely incognizant of what occurred at the time they engaged in
the charged conduct. Here, the evidence of the appellant's struggle with the
victim and his statements, “It was an accident” and “I did not mean to,” are
relevant to the defensive issues of accident and self-defense, but such
evidence does not allow a finding of recklessness given the appellant's
self-described mental state when the victim was killed. Evidence of a
defendant's inability to remember causing the death of the victim does not
entitle the defendant to a charge on the lesser-included offense of
manslaughter. . . . 

Id. (emphasis added). 
          In Schroeder, the defendant was charged with the murder of his wife by shooting
her with a firearm. Id. at 399. The defendant called 911 and told the operator that he and
his wife had struggled over a gun and that it “went off a couple of times,” shooting his wife
in her chest. Id. The deceased was shot three times, two of the bullets entered her body
from the side, and one from the back. Id. The .357 pistol contained five spent shells and
one unfired cartridge. Id. The appellant told one of the officers that “it was an accident”
and that he "did not mean to [shoot her].” Id. The defendant testified he was arguing with
his wife when she presented the pistol. They struggled, he blacked out or something, and
couldn’t remember what happened. Id. The State questioned:
Q: Do you know anything of what happened when you walked out of the
bedroom and she was standing there with the gun and you all started
wrestling to the time you all ended up and you were on top of her at the front
door? Do you remember-can you recall anything?
 
A: I remember we was wrestling around with the gun in the kitchen and
then we hit the floor and then it was, like–I don't know. I ain't going to say–
I guess I blacked out or something. I don't know. I don't remember.
 
Id. 
          In contrast, Mancha’s statement goes all the way through the episode in detail—from
hearing the planning of the robbery with Wendy and Ozzy, to entering the trailer and holding
Cahue down, to the exit of the group and burning the gloves and sweater. He recounted
wrestling with Cahue, striking him with his fists, trying to hold him down, attempting to tie
him up, trying to calm him down, details of wounds he received, Wendy’s attack, punching
him some more in the face and head, articles that were stolen, dragging Cahue into the
bathroom, burning the sweater and gloves, et cetera. Unlike Schroeder, Mancha
acknowledged striking Cahue. Furthermore, the evidence indicated Cahue was alive when
the group left, and thus Mancha could not have known that he or Wendy or anyone else had
killed Cahue. While Mancha’s statement included the self-serving or even rhetorical
comment “I don’t remember a lot[,]” that isolated sentence is belied by the extreme detail
of the lengthy confession. See Enriquez, 21 S.W.3d at 278. Our situation is unlike
Schroeder where a man struggles with his victim over a .357, and it somehow goes off at
least three times, hitting the victim in the side two times and once in the back, and the
defendant “blacked out or something.”


 
          The State maintains there is no evidence that when Mancha was hitting Cahue he
was behaving recklessly, and did not knowingly or intentionally cause Cahue’s death. The
record shows otherwise. A defendant’s statement must be considered in the context of the
entire record to determine whether there was evidence from which the jury could conclude
that a defendant was only guilty of manslaughter. Wesbrook, 29 S.W.3d 113-14; Enriquez,
21 S.W.3d at 278. The State seems to agree that members of the group only intended to
rob Cahue, but that the struggle escalated, and at some unknown time Mancha changed
his intent to murder. The argument that Mancha’s intent changed is not established by the
record. Rather, a pattern emerged showing that Cahue originally resisted the intruders and
then lowered his resistance. This seems to have happened several times while Mancha 
insisted: “I kept holding onto the old man trying to calm him down.” After Wendy kicked
Cahue, Cahue began struggling again, so Mancha punched him some more in the face and
head. According to this segment of Mancha’s statement:
I punched him some more in the face and head. I don’t remember a lot. He
was bleeding a lot from head and face. [sic] We grabbed him by his arms and
dragged him to the back room. We just took off after that in the Jeep with the
two gay guys. When I left the old boy was still breathing I did not think that
he was going to die. 
 
           Jose testified the group went to rob Cahue. He saw Mancha and Alfredo holding
Cahue down. The whole time–said here to be thirty minutes–Mancha was “holding him.” 
Mancha did hit Cahue in the face with his hand more than once. Jose said he was afraid
when they left Cahue was going to come out, fight and give chase, although Jose did not
actually see him get up. None of the State’s eye-witnesses’ testimony supports the State’s
theory on appeal that Mancha at some point escalated his intent from what can be rationally
viewed as reckless conduct to intentional homicide.
          Contrary to the State’s focus on a single sentence in Mancha’s extensive statement,
we are bound to consider all of the evidence presented by the State and the defendant in
determining whether the trial court erred in failing to give a charge on the lesser-included
offense. Jones v. State, 900 S.W.2d 103, 105 (Tex. App–Houston [14th Dist.] 1995, no
pet.). In making this assessment, we are cognizant that if evidence from any source raises
the issue of a lesser-included offense, a charge on that offense must be included in the
court's charge if requested. Id. (citing Saunders v. State, 840 S.W.2d at 391). The
determination of whether a defendant is entitled to a jury charge on a lesser-included
offense must be made on a case-by-case basis according to the particular facts. Livingston
v. State, 739 S.W.2d 311, 336 (Tex. Crim. App. 1987). The credibility of the evidence and
whether it conflicts with other evidence or is controverted may not be considered in
determining whether an instruction on a lesser-included offense should be given. Banda
v. State, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994). Regardless of its strength or
weakness, if any evidence raises the issue that the defendant was guilty only of the lesser
offense, then the charge must be given. Saunders, 840 S.W.2d at 391; O'Brien v. State,
89 S.W.3d 753, 755 (Tex. App.–Houston [1st Dist.] 2002, pet ref’d).
          The State next cites Bignall v. State, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). 
Bignall holds:
The correct test, as stated in Aguilar v. State, 682 S.W.2d 556 (Tex. Crim.
App. 1985), is as follows: “If a defendant either presents evidence that he
committed no offense or presents no evidence, and there is no evidence
otherwise showing he is guilty only of a lesser-included offense, then a charge
on a lesser-included offense is not required.” Id. at 558.
 
Id. Unlike Aguilar, Mancha did not assert that no crime was committed. And like Bignall,
Mancha’s statement, the circumstances surrounding the crime by the group of teens, and
the State’s own eyewitness testimony presented evidence of the lesser-included offense. 
See id. (holding that defendant is entitled to an instruction on a lesser-included offense if
evidence from any source raises the issue). 
          Finally, the State argues from Arnold, 234 S.W.3d at 671-72 (that fragments of
testimony “cannot be plucked out of the record and examined in a vacuum.”) Arnold held
that any inference that the gun discharged accidentally was negated by appellant's
testimony on cross-examination describing his state of mind. Id. On the stand, Arnold
testified that he intentionally or knowingly fired the gun at the victim and that it was not an
accident. He also stated: 
State: So, you shot him and you meant to do it, right?
Appellant: Yes, sir. 
Id. Arnold is very much akin to Wesbook and Mathis discussed above. Similarly, we
conclude that the cited authority is not specifically applicable to this case.
          The mental state must generally be inferred from the accused behavior and the
circumstances but the acts relied upon as proving the mental state need not be the same
act constituting the offense. George E. Dix & Robert O. Dawson, 41 Texas Practice:
Criminal Practice and Procedure § 20.171 (2d ed. 2001). The mens rea for
manslaughter is recklessness. Richie v. State, 149 S.W.3d 856, 858 (Tex. App.–Amarillo
2004, no pet.). Because manslaughter is a result of conduct offense, the definition of the
culpable mental state of recklessness is limited to the result of conduct. Perez v. State, 216
S.W.3d 855, 857 (Tex. App.–Corpus Christi 2006, pet. ref'd)(citing Cook v. State, 884
S.W.2d 485, 491 (Tex. Crim. App. 1994)). In Richie, the court explained:
[A]nd, while, according to the statutory definition of reckless, one may be
reckless regarding the circumstances surrounding his conduct or the result of
his conduct, [Tex. Penal Code Ann.] § 6.03(c), the crime defined in § 19.04(a)
simply encompasses recklessness viz the result of accused's conduct. In
other words, the legislature, in defining manslaughter, was not concerned with
whether the accused was aware of the circumstances surrounding his
conduct but rather with whether his conduct resulted in death. Id. at 858
(emphasis added).
 
Richie, 149 S.W.3d at 858. Therefore, with regard to the offense of manslaughter, the
applicable part of section 6.03(c) should read: "A person acts recklessly, or is reckless,
with respect to . . . the result of his conduct when he is aware of but consciously disregards
a substantial and unjustifiable risk that the . . . result will occur." Schroeder, 123 S.W.3d
at 400-01. For purposes of our analysis, we assume Cahue was killed as a result of
Mancha’s conduct.


 Whether the charge is murder or manslaughter, the result is identical: 
Cahue died. There is no direct evidence that Mancha intentionally or knowingly killed
Cahue.


 
            The circumstantial evidence, eyewitness testimony, and Mancha’s stated intent to
only restrain Cahue on the floor and specifically not to kill him, raised evidence of the lesser-included offense of manslaughter. Accordingly, the trial court erred in refusing the
requested instruction on manslaughter.
          The dissent states the distinction between a reckless mental state and an intentional
or knowing one is irrelevant if the defendant was indicted for an offense for which he could
be found guilty under section 19.02(b)(3) (felony murder). See Tex. Penal Code Ann.
§19.02(b)(c). However, the dissent also states that the jury was not instructed under this
section and therefore the court should apply the Malik test for evidentiary sufficiency, using
a hypothetically correct charge vis a vis the jury charge actually given. See Malik, 953
S.W.2d at 240). We disagree.
           First, no authority is cited for the extension of Malik into the question of whether or
not a lesser included charge should be given. Even the State acknowledges that the
second step in the lesser-included offense analysis is a question of fact and asks whether
the evidence actually presented at trial supported giving the instruction to the jury. See Hall
v. State, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (holding a defendant is entitled to an
instruction on a lesser-included offense where the proof for the offense charged includes
the proof necessary to establish the lesser-included offense and there is some evidence in
the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty
only of the lesser-included offense)


. 
          Remarkably, the “hypothetically correct charge” was given to the jury. The jury was
charged to find Capital Murder if: (1) Mancha intentionally caused the death of Cahue while
committing or attempting to commit robbery; or (2) Wendy intentionally caused the death
of Cahue by striking Cahue when Wendy was committing or attempting to commit robbery
and Mancha knew of her intent, and encourage her; or (3) Mancha conspired with the group
to commit robbery and Wendy intentionally caused the death of Cahue. The jury rejected
the Capital Murder charge. Instead the jury found Mancha guilty of the lesser included
offense of Murder which was given in the charge as follows: 
 
“If you find from the evidence beyond a reasonable doubt that on or about
AUGUST 6, 2008, in Hidalgo County, Texas, the Defendant, MICHAEL
ANTHONY MANCHA, did intentionally or knowingly cause the death of
MIGUEL CAHUE by stroking the victim with his hand or kicking the victim with
his foot or striking the victim with an object unknown to the Gand Jurors, but
you have a reasonable doubt as to whether the Defendant was then and
there engaged in the commission of robbery of MIGUEL CAHUE at the time
of the said striking with his hand or kicking with his foot or striking with an
object unknown to the Grand Jurors, if any, then you will find the Defendant
guilty of MURDER, but not CAPITAL MURDER.



 
          Finally, in its customary application, Malik may be utilized and due process not
necessarily violated when affirming a conviction in which the jury charge contains “extra,
unnecessary elements that are not supported by the evidence.” Id. at 238. On the other
hand, Malik recognized that due process prevents an appellate court from affirming a
conviction based upon legal and factual grounds that were not submitted to the jury. Id.
(citing McCormick v. United States, 500 U.S. 257, 269-70, 270 n. 8 (1991); Dunn v. United
States, 442 U.S. 100, 106 (1979); Cole v. Arkansas, 333 U.S. 196, 201-02,(1948)). Malik
is clearly inapplicable and its attempted application to this situation raises due process
concerns. See id. 
 
                                                                V. Harm
          The erroneous refusal to give a requested instruction on a lesser-included offense
is charge error subject to an Almanza harm analysis. Saunders, 840 S.W.2d at 392; see
also Almanza, 686 S.W.2d at 171. Reversal is required if the error resulted in some harm
to the accused, “some” meaning “any.” Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim.
App. 1986); Almanza, 686 S.W.2d at 171. When the absence of the lesser-included
offense instruction leaves the jury with the sole option either to convict the defendant of the
charged offense or to acquit him, a finding of harm is essentially automatic because the jury
was denied the opportunity to convict the defendant of the lesser offense. Saunders v.
State, 913 S.W.2d 564, 571 (Tex. Crim. App. 1995). Such is the case here. There is a
distinct possibility that the jury, believing the defendant committed homicide, but given only
the option to convict him of the greater offense of murder, chose to find him guilty of that
greater offense rather than to acquit him of any homicide, even though it had a reasonable
doubt that he really committed the greater offense.


 Id. (citing Beck v. Alabama, 447 U.S.
625, 634, (1980)). Just as the jury rejected the State’s charge of capital murder in favor
of the lesser-included murder finding, the jury could reasonably have found the death of
Cahue was recklessly caused. Accordingly, we hold that under this record, Mancha
suffered some harm from the erroneous refusal to submit the lesser-included charge of
manslaughter.
                                                                VI. Conclusion
          We reverse and remand for a new trial on all issues.
                                                                                      DON WITTIG
                                                                                      Justice
 
 
Dissenting Memorandum Opinion 
by Justice Gina M. Benavides.
Do not publish.
Tex. R. App. P. 47.2(b).
Delivered and filed the 
14th day of April, 2011.